Robert S. Green (State Bar No. 136183)
Emrah M. Sumer (State Bar No. 329181)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

Attorneys for Plaintiff
ORLANDO SALAS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORLANDO SALAS, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>vs.<br><br>WHIRLPOOL CORPORATION and AIG WARRANTYGUARD, INC.,<br><br>       Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT** |

CLASS ACTION COMPLAINT

Plaintiff Orlando Salas ("Salas" or "Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to him and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendants Whirlpool Corporation and AIG WarrantyGuard, Inc. (collectively "Defendants"), and alleges as follows:

## I.    NATURE OF THE ACTION

1.    Defendants Whirlpool Corporation ("Whirlpool") and AIG WarrantyGuard, Inc. ("AIG") are engaged in an ongoing business partnership to market and sell extended repair plans ("Service Plans") to consumers who purchase household appliances that Whirlpool markets under various brand names.

2.    Defendants market the Service Plans to consumers in a variety of ways such as by advertising the plans on Whirlpool's websites, and by contacting consumers who register their appliances with Whirlpool, confirming that their product has been registered, and urging them to take the next step of appliance protection by purchasing a Service Plan.

3.    Both the manner in which the Service Plans are promoted and the content of Defendants' marketing materials leave consumers with the impression that the plans are offered by Whirlpool, that they effectively work as an extension of Whirlpool's original manufacturer's warranty, and offer protection comparable to the manufacturer's warranty.

4.    Defendants make various claims to prospective plan purchasers – such as ". . . Add a 3-year plan to your 1-year warranty for a total of 4 years of coverage" and "[W]e want you to receive best-in-class service using factory certified parts and technicians. That's why we created the Whirlpool Service Plan" – that contribute to the misperception that the Service Plans are extensions of the Whirlpool manufacturer's warranty.

00126321.000

5.      In addition, Defendants promote the Service Plans on Whirlpool's websites with claims such as "If We Can't Fix It – We'll Replace It", and "No Deductible", and with charts that show the purported savings that a Plan purchaser can enjoy by having the Service Plan pay for the appliance repairs that would otherwise fall on the consumer or replace the appliance without any extra cost to the consumer.

6.      These statements lead consumers to believe that by purchasing a Service Plan they can shield themselves from unexpected repair costs for the life of their Service Plan – that, in case of an appliance failure, Defendants will either pay to have the appliance repaired or provide a new appliance.

7.      Defendants contribute to this misperception by advertising their claims on websites owned by Whirlpool – the company which manufactures these appliances and would have deep knowledge about the reliability of its appliances.

8.      Unbeknownst to consumers who purchase a Service Plan ("Plan purchaser(s)"), Defendants employ an undisclosed business practice to establish a dollar limit ("Payout Limit") on how much they will pay to repair or replace each appliance they cover under a Service Plan. Defendants use these Payout Limits when deciding whether to repair/replace an appliance or to make a one-time cash payment ("Payout") to Plan purchasers after the payment of which Defendants assert that their contractual obligations for the unexpired term of the Service Plan are extinguished.

9.      Defendants regularly choose to issue a Payout rather than to repair or replace a covered appliance even when this option does not provide the Plan purchaser with sufficient compensation to repair his appliance or to purchase a replacement.

10.      Defendants' systematic use of undisclosed Payout Limits, which violates multiple statutes including the Consumers Legal Remedies Act and the Song-Beverly Warranty Act, is a mechanism designed to unfairly boost

00126321.000

Defendants' profits at the expense of Plan purchasers. Despite Defendants' widespread use of them, Payout Limits are not mentioned in Defendants' online advertising or in the Service Contracts[1] pursuant to which the Service Plans are provided.

11.    Defendants' misrepresentations about the Service Plans also obscure the fact that the level of service a Plan purchaser can receive through the Service Plan is often unreliable and less than what the Plan purchaser would receive by submitting the same claim under Whirlpool's manufacturer's warranty. Consumer complaints to the Better Business Bureau describe consumers' experience, upon calling Whirlpool, of being placed on hold for hours before they could submit a claim under the Service Plan and, after claim submission, having to wait for months before getting their appliance repaired.

12.    After a Plan purchaser purchases a Service Plan, Defendants send him instructions directing him to file future claims by calling a phone number specifically set up to handle Service Plan claims – even if the Plan purchaser has an appliance that is still covered under the manufacturer's warranty. By routing repair claims that are covered under its manufacturer's warranty to the inferior Service Plan, Whirlpool saves money and increases its profits at the Plan purchasers' expense.

13.    Defendants' policy of having its Service Plan overlap with the manufacturer's warranty for Service Plans offered in California violates the Song-Beverly Warranty Act.

14.    Plaintiff was deceived by Defendants' communications which caused him to submit his claim under the Service Plan at a time when his appliance was still covered under the manufacturer's warranty. However, the coverage provided under the Service Plan is inferior to the coverage available under the manufacturer's warranty and, in Plaintiff's case, resulted in an unsatisfactory

---

[1] Entitled "Service Contract – Repair Plan".

service visit at the end of which Plaintiff's appliance was not repaired. Under the misperception that the manufacturer's warranty and the Service Plan worked in unison, Plaintiff concluded that he could not have his appliance repaired by Whirlpool, so he hired and paid a third-party contractor to repair his appliance. But for Defendants' misrepresentations, Plaintiff would have sought repairs under the manufacturer's warranty and not incurred out-of-pocket expenses for these repairs.

15. By shifting the cost of repairs that would have been covered under its manufacturer's warranty to Plaintiff, Whirlpool received economic benefits from the confusion that its communications caused.

16. Defendants' unfair business practices also extend to willful contractual violations implemented as corporate policy. For example, as part of its procedures for issuing Payouts, the administrator of the Service Plans ("Administrator") – which, during the class period pertaining to this action, was identified in the Service Contracts as either AIG or Whirlpool depending on when the Service Plan was issued – requires as a condition for payment that Plan purchasers agree to dispose of the non-working appliance at their own expense in accordance with federal, state or local laws, and to sign a statement ("Buyout Letter") stating that they agree with Defendants' decision to issue a Payout (which is referred to as the "Buyout" option), and that they consider AIG's obligations under the Service Plan to be fully satisfied. These additional requirements are neither disclosed in the website advertising nor provided for under the Service Plan terms and conditions. Nor do Defendants care that the Plan purchaser may not have agreed to a Buyout as the Buyout Letter purports. The Administrator's policy is to withhold payments from Plan purchasers who do not comply with the demands set forth in the Buyout Letter. It does so in violation of its obligations under the Service Plan.

00126321.000

17.    Defendants' fraudulent and misleading conduct renders the Service Plans essentially worthless or, at a minimum, makes the economic value of each Service Plan sold by Defendants to be only a fraction of the value that a reasonable consumer would place on these plans based on the fraudulent information provided to them by Defendants up to the time of purchase. For example, Defendants' policy of requiring Plan purchasers to dispose of a repairable appliance (upon Defendants' decision to exercise a Buyout option) not only deprives the consumer of the repair coverage he was promised. It also prevents the Plan purchaser from collecting a Payout from Defendants, however inadequate, and supplementing that Payout with his own funds to have his appliance repaired. This option is not available to Plan purchasers because Defendants will not issue a Payout unless the Plan purchaser agrees to dispose of the appliance, which necessarily precludes it from being repaired.

18.    AIG is liable for Whirlpool's actions because it directs or permits Whirlpool's conduct, and/or benefits from it.

19.    Whirlpool is liable for AIG's actions because it permits, participates in, or benefits from AIG's conduct and, where applicable, because it fails to fulfill its obligations as the administrator of the Service Contracts.

20.    On behalf of the Class, Plaintiff seeks to redress Defendants' conduct under state common law and consumer-protection statutes.

## II.    PARTIES

### _Plaintiff Orlando Salas_

21.    Plaintiff Orlando Salas resides in Riverside, California.

### _Defendants Whirlpool Corporation and AIG WarrantyGuard, Inc._

22.    Defendant Whirlpool Corporation is a Delaware corporation headquartered in Benton Harbor, Michigan. Whirlpool manufactures and markets home appliances – including laundry appliances, refrigerators and freezers, cooking appliances, and dishwashers.

23.    Defendant AIG WarrantyGuard, Inc. is a Delaware corporation with principal offices in Chicago, Illinois.

24.    Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein each Defendant, whether actually or fictitiously named herein, and whether such agency relationship was disclosed to the Plaintiff, was the  principal, agent (actual or ostensible), joint venture or employee of each other Defendant, and in acting as such principal or within the course and scope of such agency, joint venture, or employment took some part in the acts and omissions alleged herein, by reason of which each Defendant is jointly and severally liable to Plaintiff for the relief prayed for herein.

## III.    JURISDICTION

25.    Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendants, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

26.    This Court has specific personal jurisdiction over Defendants with regard to the claims asserted in this action because Defendants' contacts with the state of California in which this Court is located are continuous, systematic, and purposeful, and the specific claims in this action arise from those particular contacts.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District. In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction with respect to this action.

## IV.    FACTUAL ALLEGATIONS

28.    Whirlpool markets its portfolio of home appliances ("Whirlpool Appliances") to consumers in the United States under the brands Amana,

KitchenAid, Maytag, and Whirlpool; and offers post-sale repair services to consumers pursuant to the manufacturer's warranty that accompanies eligible Whirlpool Appliances.

29.    AIG and Whirlpool are engaged in an ongoing business collaboration whereby they market, sell, and administer Service Plans to consumers who purchase Whirlpool Appliances. These Service Plans are presented to the consumer as an option to extend the original manufacturer's warranty.

30.    The Service Plan for a given appliance is offered to consumers with the option to select a term of coverage beyond the expiration of the factory warranty, for as short as one year and as long as five years. AIG charges a higher price for a given Service Plan as the plan term gets longer.

31.    The Service Plans are marketed to consumers in a variety of ways including through websites controlled by Whirlpool, in correspondences that Whirlpool mails to consumers who register with Whirlpool after purchasing a Whirlpool Appliance, or by emails from the brand of appliance being registered (e.g., Whirlpool, KitchenAid, etc.). All of these marketing channels leads consumers to the Whirlpool controlled websites which cause consumers to believe that Whirlpool (or one of the Whirlpool brands) is the party offering the Service Plans.

32.    However, the Service Plans are offered by AIG which is identified in the buried terms of the Service Contract as the party that is entering into a contractual relationship with the consumer purchasing the plan.

33.    Whirlpool provides services such as responding to requests that consumers make under the Service Plans, arranging for appliance repair services, and handling consumers' Service Plan related complaints. Whirlpool is also identified as the plan Administrator in Service Plans that were issued after June 13, 2022.

CLASS ACTION COMPLAINT

## A.    The Whirlpool Websites

34.    Whirlpool markets the Service Plans through the websites it owns and operates – www.amana.com, www.jennair.com, www.kitchenaid.com, www.maytag.com, www.whirlpool.com (collectively "Whirlpool Websites") – and through which it markets its appliances, communicates with consumers, and manages warranty related repair requests.

35.    Each of the Whirlpool Websites contains substantially similar misrepresentations and omissions about the Service Plans offered for the relevant brand (for example, the Amana website promotes the "Amana Plan"), offers similar functionality, and utilizes a similar sequence of webpages that result in the sale of a Service Plan to a consumer.

36.    The Whirlpool Websites present the Service Plans to consumers as a way to extend the original manufacturer's warranty offered under a particular appliance brand, and provide consumers with the ability to purchase Service Plans online.

37.    For example, the website for appliances that are manufactured under the Whirlpool brand features a page[2] titled "Extended Service Plans" which promotes a Service Plan that it refers to as the "Whirlpool plan". The webpage explains the Service Plan as beginning after the manufacturer's warranty ends and continuing for several more years based on how many years of additional coverage is purchased by the consumer. It provides an example of how this might work for someone who purchases a three-year extension with the line "EX: Add a 3-year plan to your 1-year warranty for a total of 4 years of coverage."

38.    The webpage also provides a side-by-side comparison of the Service Plan to a "Typical retailer's plan" where the Service Plan is described as offering appliance repair using "Factory Certified Parts" by "Factory Certified

---

[2] https://www.whirlpool.com/services/service-plans.html, last visited on May 18, 2023.

CLASS ACTION COMPLAINT

00126321.000

Technicians" in contrast to the "Typical Retailer's Plan" which is presented as not offering these benefits.

39.    These representations lead the visitor into believing that the Service Plan is an offer by Whirlpool to extend its original manufacturer's warranty. Nothing on the page puts the consumer on notice that the Service Plan is, in fact, offered, issued, and contractually fulfilled by an entity other than Whirlpool. Here is one of these pages:

# Flexible appliance protection plans for your needs



No-hassle claim process



Service scheduled at your convenience



Protect multiple appliances under one plan



Payment plan options

| Whirlpool service advantage | Whirlpool Plan | Typical Retailer's Plan |
|---|---|---|
| Plan Begins After Manufacturer Warranty Ends | ✓<br>EX: Add a 3-year plan to your 1-year warranty for a total of 4 years of coverage. | Many retail plans begin before the Free Standard Warranty ends, resulting in fewer years of coverage. |
| Factory Certified Parts | ✓ | ✗ |
| Factory Certified Technicians | ✓ | ✗ |
| Payment Plan Options | ✓<br>Available for the 3-year plan. | ✗ |
| Exclusive Discount Program Access | ✓<br>Private access to exclusive savings and perks on top appliances. | ✗ |

00126321.000
CLASS ACTION COMPLAINT

40.    When the consumer clicks on a button labeled "ADD A PLAN TODAY" he is taken to another page[3] which allows him to enter information about his appliance and obtain a quote for a Service Plan.

41.    This page furthers the misperception that Whirlpool is the party offering the plan. Under the heading "Experiencing the Whirlpool Advantage" the page declares "[W]e want you to receive best-in-class service using <u>factory certified parts and technicians</u>. That's why we created the Whirlpool Service Plan." (Emphasis in original.)

42.    The only indication that Whirlpool may not be the party offering the Service Plans is the small font footer that is shown at the bottom of this page (but not shown on the Extended Service Plans webpage). However, this small font disclaimer at the bottom of the page is insufficient to put the consumer on notice that the Service Plans are not offered by Whirlpool when multiple prominently displayed representations throughout the page lead consumers to believe otherwise.

43.    On the other hand, the webpage makes additional claims that build on the representation that the Service Plans are an extension of the original manufacturer's warranty with similar benefits.

44.    For example, under a list titled "Top 5 Coverage Features", the webpage advertises "No Deductible" and "If We Can't Fix It – We Replace It[2]". Elsewhere on the website, the service plan is promoted in FAQ question and answer form: "Why buy a Service Plan? Over time, appliances may require service repairs or replacements. Once the manufacturer's warranty expires, these could be unexpected and costly. With a Service Plan, if a covered incident occurs we'll repair or replace it."

45.    Defendants' advertised policies are consistent with the expectations of a typical consumer that the Service Plan provider will repair a malfunctioning

---

[3] https://serviceplans.whirlpool.com/, last visited on May 18, 2023.

CLASS ACTION COMPLAINT

**Top 5 Coverage Features**

- No Deductible
- 100% Factory Certified Parts and Technicians
- Only Pre-Qualified Technicians
- U.S. Based Customer Care Center
- If We Can't Fix It – We Replace It[2]

Learn More

**Compare the Savings**

| Major Component | Cost of Repair Without a Plan[1] | Average 1-Year Service Plan Price |
|---|---|---|
| **Washer** Pump | $424 | $53 |
| **Dryer** Control Assembly | $430 | $51 |
| **Dishwasher** Main Motor | $410 | $46 |
| **Refrigerator** Compressor | $805 | $106 |
| **Range** Thermostat | $396 | $56 |

[1]Includes average parts and labor costs. Actual incidents and repair costs may vary.
[2]A replacement may be of like kind and quality, or in the form of a reimbursement based on the product's original price and age. See the complete terms and conditions for details.

**Additional Years of Whirlpool Quality Coverage**

| Standard Warranty | +1 | +2 | +3 | +4 | +5 Best Value |
|---|---|---|---|---|---|

1 Year (Typically) | Additional Years of Coverage Available

A Whirlpool Service Plan provides reliable coverage, with 100% certified parts and technicians, over the lifetime of your product. Act now to stay covered beyond the limited manufacturer's warranty period.

appliance, regardless of the repair cost, during the warranty period at no expense to the consumer. They do not put a consumer on notice that, even if an incident is covered under the policy, AIG may claim that certain provisions in the Service Contract give it unlimited discretion to avoid repairing or replacing the appliance, but make a one-time cash payment – in an amount that neither covers the cost of the needed repairs nor is sufficient for the Plan purchaser to purchase a comparable replacement to the non-functioning appliance – after which AIG will consider its obligations under the plan extinguished.

46.     As shown on the sample page from Whirlpool's website above, immediately next to the Top 5 Coverage Features, the webpage displays a table ("Compare the Savings") advertising the purported savings that a consumer who purchases the Service Plan would enjoy in the event of an appliance breakdown. For example, row three of the table suggests that, in the event of a failed refrigerator compressor, the Service Plan would cover the consumer's repair costs

-11-

CLASS ACTION COMPLAINT

– estimated at $805. Nothing in the webpage indicates that there is a cap to the cost of repairs that are covered under the  Service Plan except perhaps the claim "If We Can't Fix It – We Replace It", which might be construed to mean that the Service Plan provider may choose to pay for a new appliance rather than covering a very costly repair.

47.     What is omitted from the Compare the Savings table is the fact that AIG will often choose to not pay $805 to the Plan purchaser, not repair the refrigerator, and not replace the malfunctioning appliance with a new refrigerator. Instead, AIG will pay the Plan purchaser a discounted amount, based on the Payout Limit it has established internally or in collaboration with Whirlpool, and terminate the Plan purchaser's Service Plan, thus depriving the Plan purchaser both of the working appliance he was promised and the service plan coverage he bargained for.

48.     Right below the Compare the Savings table, the webpage displays a graphic which advertises that a consumer can obtain up to five "Additional Years of Whirlpool Quality Coverage" by purchasing a Service Plan. The graphic makes the claim that purchasing the five year plan offers the best value to the consumer. The statement below the graphic reinforces the message: "a Whirlpool Service Plan provides reliable coverage, with 100% certified parts and technicians, over the lifetime of your product." Together, the representation that purchasing five years of coverage provides the best value combined with the representation that the plan offers reliable coverage over the lifetime of the product lead the consumer to believe that the Service Plan would cover as many repairs as needed to keep the appliance functioning for the entire plan duration.

49.     The representations are misleading both for the reason that purchasing a five-year plan does not always offer the best value and because Service Plans come with many off-ramps that purport to excuse Defendants from

00126321.000

providing Plan purchasers with reliable coverage over the term of the Service Plan.

50.    Elsewhere, the web page provides a tool for consumers to enter product information about their appliance and obtain a quote to purchase a Service Plan. Based on the information provided by the consumer, the website presents the consumer with Service Plans of different durations to choose from. The consumer can select the Service Plan duration he desires, pay for it, and finalize his purchase. During this process, the consumer is neither shown nor provided with the Service Contract pertaining to the specific Purchase Plan he is purchasing. Nor is the consumer provided with a copy of the Certificate of Coverage that is referenced in the Service Contract.

### B.    Undisclosed Facts About the Service Plans

51.    The Service Plans materially differ from the representations made on Whirlpool Websites in several ways including the identity of the party offering the plans, how the plans compare to original manufacturer's warranties, the extent of repair or replacement coverage consumers receive under the Service Plans, and Defendants' policies for administering claims submitted by Plan purchasers.

52.    Defendants' business practice is to disclose some of these facts to the Plan purchaser eventually, but only after he has purchased a Service Plan and been sent his Service Contract – a practice that violates multiple statutes because legislators have recognized the need to provide adequate disclosures before a consumer enters into a contractual commitment.

53.    Putting aside the fact that Defendants' untimely disclosures in the Service Contracts are unlawful, Defendants' vague and misleading representation of material contractual terms in the Service Contracts violate additional statutes.

54.    Beyond inserting vague and misleading terms in the Service Contracts, Defendants employ business policies that impose previously undisclosed, extra-contractual obligations on Plan purchasers who submit claims

00126321.000

under a Service Plan. These policies constitute unfair and unlawful business practices as further discussed herein.

55.     The following contractual terms are not disclosed to the consumers as of the time that they are purchasing the Service Plan and entering into a contractual relationship with AIG:

a.     The Service Plan is offered by AIG, not Whirlpool;

b.     The Service Contract gives AIG the option, at AIG's sole discretion, to refuse the repair or replacement of a covered appliance by issuing a cash Payout to the Plan purchaser;

c.     If AIG chooses to exercise the Buyout option, the Payout that it owes to the Plan purchaser is capped at the higher of (i) the annual cost of the Service Plan, and (ii) 75% of the original purchase price of the covered appliance. (In practice, this always limits AIG's payment obligation under the Service Plan to 75% of the original purchase price of the appliance – regardless of what the actual replacement cost of the appliance would be. Thus, a Plan purchaser who purchases an expensive closeout appliance from a retailer at a deeply discounted price and decides to protect it with a Service Plan that Defendants market with the "If We Can't Fix It – We Replace It" claim would discover after filing a claim under the Service Plan that he is not entitled to the repair or replacement of his failed appliance. AIG could absolve itself of its obligations under the plan by paying the consumer just 75% of the discounted purchase price.)[4]

---

[4] There are many other scenarios where the Defendants' purchase-price based payout formula is woefully inadequate to make a Plan purchaser whole after Defendants exercise their Buyout option. For example, Defendants also provide Service Plans for appliances that were obtained under a home warranty insurance policy. However, home warranty insurance providers do not pay retail prices. They negotiate deep discounts from vendors for the appliances they purchase.

00126321.000

d.    In contrast, if the cost of the covered appliance has dropped below what the consumer paid to purchase it, AIG reserves the right to profit from this discrepancy under a provision that allows it to replace the covered appliance with a similar product that may have a lower purchase price (the "Exchange" option);

e.    Despite representations on the Whirlpool Websites that the plan offers "100% Factory Certified Parts and Technicians", the Exchange option gives AIG the right to exchange a covered appliance with a new or refurbished appliance which may contain non-original manufactured parts;

f.    Upon exercising the Exchange option and providing the Plan purchaser, at AIG's sole discretion, with a refurbished replacement product containing non-original manufactured parts, AIG's obligations under the Service Contract are fulfilled and AIG absolves itself of all liability as to future problems the Plan purchaser may experience with the refurbished replacement product provided by AIG. (Tellingly, the Service Contract's section pertaining to plan eligibility exclude refurbished appliances from coverage under the Service Plan.)

g.    Upon exercising the Buyout or Exchange options, AIG claims that its obligations under the Service Contract are satisfied and the Plan purchaser loses the remaining coverage that he bargained and paid for under the Service Plan.

---

In the case of a Plan purchaser trying to have Defendants pay for the repairs of a home warranty insurer provided appliance, Defendants' policy is to pay the Plan purchaser 75% of the purchase price paid by the home warranty provider. Most consumers will not be able to purchase a similar appliance at such a price.

CLASS ACTION COMPLAINT

00126321.000

56.     Other contractual provisions are not clearly and conspicuously disclosed in the Service Contract and, further, are buried under unlikely headings in the Service Contract where the typical consumer would not know to look for them. Some other provisions allow for outcomes which Defendants, as the parties administering the plans, fully understand but consumers reviewing a Service Contract would have no way to know about. As such, these provisions do not constitute adequate disclosures even for a consumer who receives the Service Contract after having purchased a Service Plan and takes the time to review it. These inadequately disclosed provisions provide that:

a.     AIG's obligations for any claim filed by a Plan purchaser are limited to no more than 75% of the purchase price that the Plan purchaser paid for the appliance, which means that Plan purchasers whose covered appliances cannot be repaired within that limit neither have the right to have their appliance repaired nor replaced. Instead, AIG can terminate its obligations under the Service Plan by issuing a discounted Payout to these Plan purchasers. In the process, AIG also benefits by unilaterally shortening the duration of the Service Plan that the Plan purchaser has already purchased and paid for;

b.     For Plan purchasers who purchase a Service Plan after purchasing their appliance, AIG's maximum liability for a filed claim can be as low as 25% of the purchase price of the appliance;

c.     The Payout that AIG must pay to Plan purchasers upon exercising its Buyout option is usually so low that it is insufficient to cover the needed repairs for a failed appliance or to pay for its replacement.

00126321.000

57.     Whereas the Service Contract calls attention to certain contract provisions by printing them in bold font or in capitalized letters (*see, e.g.*, Exhibit 1, ¶18, "EXCLUSIONS"), the foregoing provisions – which limit coverage and would logically be listed in discussed in section "18. EXCLUSIONS" – are placed elsewhere in the Service Contract where they are concealed under the harmless sounding section header "11. SERVICE EVENT" and printed in regular font so as to escape notice.[5]

58.     Causing further consumer confusion, AIG inserts language in other parts of the Service Contract which leads consumers to believe that AIG uses the Buyout option only when it cannot repair a covered appliance. (See, Ex. 1, ¶12, "UNABLE TO REPAIR", ("If We determine that We are unable to repair Your Product for any reason, such as the unavailability of functional part, service, or technical information, We will Exchange or Buyout Your Product as provided in Section 14.") A consumer reading this provision and not seeing any contrary language either here or in the "EXCLUSIONS" section would have no reason to think that  AIG has buried another provision in the Service Contract to absolve it from repairing a covered appliance.

59.     Finally, AIG completely omits from the Service Contract many of their business practices which, if known to the average consumer, would deter them from purchasing a Service Plan. These practices include the following:

    a.     It is AIG's business policy to determine a Payout Limit for each Service Plan it enters into;

    b.     The Payout Limits are used by AIG to determine whether AIG will pay for the required repairs when a Plan purchaser files a

---

[5] Defendants have employed two different versions of the Service Contract during the Class Period applicable to this Complaint – a version that was in effect from May 2017 to June 12, 2022 and another version that has been in effect from June 13, 2022 to the present. Both versions contain terms that are materially the same for the purposes of the claims made in this Complaint. For consistency, this Complaint references the version that has been in effect since June 13, 2022 and is attached hereto as Exhibit 1.

claim under the Service Plan or exercise its Buyout option to get out of the Service Plan coverage that remains on the policy (as of the time a claim is filed) without paying for the required repairs or replacing the appliance;

c.     When the estimated repairs under a claim exceed the Payout Limit, AIG routinely exercises its Buyout option even if the product can be repaired. AIG exercises its Buyout option in order to maximize its profits even though it knows, or should know, that its decision to exercise these options would result in the Plan purchaser not being made whole as to the appliance he would have to replace and the Service Plan coverage he already paid for;

d.     Contrary to the Whirlpool Websites' claims which do not mention the Payout Limit, and the Service Contract which vaguely provides the contractual bases for it under the guise that this is a remedy that AIG might utilize only on occasion, AIG's Payout Limit policy is an integral part of its business model. In failing to fully disclose the Payout Limit to consumers, Defendants deprive consumers of material information that is relevant to their decisions to purchase a Service Plan or (having been informed of this information after plan purchase) to cancel a Service Plan in order to obtain a refund;

e.     When AIG exercises its Buyout option (which AIG does without consulting with the Plan purchaser – and often against the Plan purchaser's wishes), the plan Administrator routinely conditions the release of the Payout on the Plan purchaser's compliance with terms that are neither disclosed on Whirlpool

Websites nor provided for under the Service Contracts. These extra-contractual requirements include the following:

i.   Upon informing a Plan purchaser that AIG will exercise its Buyout option rather than paying for the repair of a covered appliance, the Administrator informs the Plan purchaser that he must render the appliance "unusable for any future purpose", dispose of the destroyed appliance "in accordance with federal, state, and local regulations", and provide Whirlpool with an affidavit affirming that the Plan purchaser agrees to complete these tasks;

ii.  The Administrator requires the Plan purchaser to affirm his intent to perform these tasks at his own expense – even though the Service Contract does not disclose any of these requirements, let alone who will pay for them;

iii. In addition to the foregoing requirements, the Administrator requires the Plan purchaser to sign its form Buyout Letter which states that to proceed with Defendants' "buyout offer for your appliance", the Plan purchaser must (i) accept that AIG and the Administrator have satisfied all of their contractual obligations owed under the Service Plan; (ii) further agree to the obligations imposed on him under the Buyout Letter; and (iii) agree that he is authorizing AIG and the Administrator to proceed with the "offered Buyout";

iv.  Despite Defendants' choice of words, the "buyout offer" is not an offer at all, but a mechanism that Defendants may exercise whether or not the Plan purchaser agrees to

it. If a Plan purchaser refuses to sign the Buyout Letter on the ground that it imposes conditions that are not part of the parties' contract, Defendants refuse to fulfill their payment obligations under the Service Contract. They refuse to pay for the covered appliance's repairs and pocket any Payout that is identified in the Service Contract as owing to the consumer. The Plan purchaser ends up receiving no benefits despite having paid for the Service Plan and complied with all requirements imposed on him under the Service Contract;

v.    Even after strong-arming a Plan purchaser to sign the Buyout Letter and give up his contractual rights, AIG and the Administrator reserve the right to change or revoke their "Buyout offer" or to reduce the amount they are offering as a cash settlement.

60.    The foregoing practices, which Defendants do not disclose at time of purchase, render the Service Plans essentially worthless or, at minimum, reduce the economic value of a Service Plan substantially below what a reasonable consumer would be willing to pay for it if he knew of these practices prior to purchase. For example, by exercising the Buyout option and shifting the cost of the appliance disposal to the Plan purchaser, Defendants further reduce the net proceeds that the Plan purchaser might receive from an already unfair cash settlement price while they pocket unlawful profits. None of this is information is disclosed to the Plan purchasers at the time of purchase.

61.    The foregoing practices render Whirlpool Websites' claims that purchasing a five-year Service Plan offers the best value to the consumer false because, under Defendants' policies, many policyholders who pay additional money for the five-year plan do not receive more coverage than a policyholder

00126321.000

with a shorter plan. Upon the occurrence of the first appliance malfunction that triggers AIG's Payout Limit, AIG or the Administrator exercises the Buyout option, wipes out the term remaining in the Plan purchaser's Service Plan, and renders the plan's term no longer than a comparable Service Plan with a shorter term.

62.    In addition, a consumer who visits the Whirlpool Websites and concludes that Defendants' Service Plans would entitle him to a level of service that is comparable to what Whirlpool provides under its manufacturer's warranty, is misled into purchasing an inferior service.

63.    In fact, the level of service that Defendants offer under the Service Plan is so poor that many Plan purchasers with active coverage give up trying to have their appliance repaired under the Service Plan and instead pay a third-party to repair their appliances.

64.    Exhibit 2 to the Complaint lists the user reviews that had been posted on the Better Business Bureau's website about the Service Plans as of May 5, 2023. A sampling of the consumer reviews includes:

> a.    0 STARS REALLY! Bought Kitchen Aid DW, 5.2020; exchanged Best Buy Service Contract for KA "BETTER" offer in mail. Was never shown contract before signing up on phone line. Turned out AIG was servicer and after 2 yrs trying to get help with door gasket, was told they had no one to perform my service in my area. In Contract, small print, they would buy out my 2 year old DW for 75% of purchase price!!! Had to take it as DW broke! STILL get ads from KA for "great offer" service contract on-line and in mail AND with different Service Contract prices on different offers! This feels like a scam to me. Have searched for Class Action suits vs KA, AND AIG. CAN'T FIND ONE. THERE SHOULD BE ONE!

b.  If I could give less than one star I would. I have gotten nothing but the runaround with them. My refrigerator was less than a year old when I had to call for service. Now that the warranty is under the extended plan, I can't get anyone out here to fix it. I am now going on two months with still no repair. Never never never buy this extended warranty! You are basically just giving them free money.

c.  Have dragged this out almost a year and washer is still not fixed.

d.  This company SERVICE NET PART OF AIG needs to be put out of business. I purchased an extended warranty from them. I've contacted them multiple times on the ice maker on my Whirlpool appliance. They only have one provider in the city of Houston (a town with population that exceeds 6 million people.) It takes several hours of waiting to get an appointment and an additional two week wait for their one provider to come out. When their provider **** *** ********* ******* has come out they are unable to make the necessary repairs. So what are they doing with the money for the extended service warranty when in fact they are not providing a service. If anyone is starting a class action suit against them, please call me and count me in.

**C.    Facts as to Whirlpool**

65.    Whirlpool is liable for the violations alleged in this complaint for conduct including but not limited to the following:

a.  Whirlpool gives AIG permission to market the Service Plans under its trademarked brand names such as the "Whirlpool Plan", and the "Amana Plan";

-22-

00126321.000

b.  Whirlpool directly or indirectly shares the names and contact information of consumers who submit appliance registration information to it with AIG or its agents, who then solicit these consumers to purchase Service Plans;

c.  In literature that it provides to consumers in conjunction with the sale of a Whirlpool Appliance, Whirlpool inserts language that leads consumers to believe the Service Plans are offered by Whirlpool and are an improvement over Whirlpool's manufacturer's warranty. For example, the Amana manufacturer's warranty, which is attached hereto as Exhibit 3, states "If you want a longer or more comprehensive warranty than the limited warranty that comes with this major appliance, you should ask Amana or your retailer about buying an extended warranty."

d.  This message is reinforced by the use of the term "extended warranty" in some of the emails sent to consumers after they register their appliances with Whirlpool. For example, an email sent to a consumer who registered his Amana product stated "Welcome to Amana brand family" and contained the message "Learn more about extended warranties. Warranty >" which linked to a page on a Whirlpool Website where Service Plans are promoted. Upon clicking on this link, the consumer was navigated to a page that advertised the purported benefits of an Amana Service Plan which included the representation "Repair or Replace. If we can't fix it, we'll replace it at no extra cost."[6]

_____

[6] The link directs the reader to https://www.amana.com/owners/service-plans.html. Most recently visited on June 29, 2023.

CLASS ACTION COMPLAINT

00126321.000

A printout of this webpage as it existed on June 29, 2023 is attached hereto as Exhibit 4.

e.    Neither the email nor the webpage disclose AIG's involvement in the Service Plans.

f.    Whirlpool owns and controls the Whirlpool Websites where it allows the Service Plans to be marketed in a misleading manner and to be sold to consumers. Whirlpool permits and participates in these activities even though it knows or should know that its conduct violates the statutes identified herein, that the Service Plan imposes conditions on Plan purchasers that are inconsistent with the representations made on the Whirlpool Websites, and that Defendants' business practices are inconsistent with the terms of the Service Contracts being sold through the websites;

g.    Whirlpool is identified as the plan Administrator in Service Contracts sold after June 13, 2022;

h.    During at least some of the Class Period, Whirlpool:

    i.    Managed consumer inquiries and complaints about the Service Plans;

    ii.    Represented itself as a party to the Service Contract by sending communications to Plan purchasers – including Buyout Letters – which contain Whirlpool trademarks, referring to the author of the communications as "we", requesting that responses to Service Plan related communications be sent to email domains it controls (e.g., AIGService@whirlpool.com), and signing such communications as the "Whirlpool Corporation";

    iii.    Serviced the appliances covered under the Service Plan;

CLASS ACTION COMPLAINT

iv.    Enforced policies requiring Plan purchasers to comply with Buyout conditions such as those stated in the Buyout Letter despite the absence of such requirements in the Service Contract;

i.    Whirlpool receives financial benefits from its collaboration with AIG on the marketing and sale of Service Plans to consumers.

**D.    Facts as to AIG**

66.    AIG is liable for the violations alleged in this complaint for conduct including but not limited to the following activities:

a.    Despite knowing the misleading nature of the representations that are made on Whirlpool Websites about the Service Plans, AIG allows its Service Plans to be sold through the Whirlpool Websites;

b.    AIG creates or approves the use of the Service Contract – a contract of adhesion authored by AIG or its agents – for its Service Plans;

c.    AIG represents itself as the party issuing the Service Plans and the Obligor in the Security Contract, and agrees to be bound by the terms of the Service Contract;

d.    AIG is identified as the plan Administrator in Service Contracts sold between January 1, 2016 and June 12, 2022;

e.    AIG uses or allows to be used Whirlpool's trademarks in communications that are sent to Plan purchasers under the Service Plan;

f.    AIG administers, or instructs or permits Whirlpool to administer, the Service Plans in a manner that results in the Buyout options to be exercised in contradiction to the

representations made on the Whirlpool Websites and in the
Service Contracts;

g.    AIG establishes or causes to be established a "Payout Limit"
for the appliances that are covered under its Service Plans;

h.    AIG institutes, sanctions, or permits the business policies that
trigger the Buyout option under the Service Contract when a
Payout Limit is reached or likely to be reached;

i.    AIG receives financial benefits from its collaboration with
Whirlpool on the marketing and sale of Service Plans to
consumers.

**E.    Facts as to Plaintiff**

67.    Around July 21, 2022, Plaintiff purchased a Whirlpool range and
registered his purchase with Whirlpool.

68.    Around August 25, 2022, Plaintiff received a marketing email which
thanked Plaintiff for registering his Whirlpool Range and urged him to purchase a
Service Plan with the language: "Now is the time to protect your appliance with a
Whirlpool Service Plan. A Whirlpool Service Plan offers exceptional value and
provides peace of mind knowing your Range is protected in the event of an
issue."[7] This email appears to have been sent by or at the behest of Defendants
using the product registration information Plaintiff provided to Whirlpool.

69.    Plaintiff clicked on the link "Learn more about a Whirlpool Service
Plan" within the email and was taken to the Whirlpool controlled website which
markets Whirlpool Service Plans as detailed above.

70.    The information on the website led Plaintiff to believe that the
Service Plan was an offer to extend the warranty coverage on his appliance with
terms materially similar to Whirlpool's manufacturer warranty.

---

[7] Earlier in the Class Period, Whirlpool sent similar emails to consumers which referred to its
Service Plan as an "extended warranty". The fact that it reworded its solicitation suggests it was
aware of the consumer confusion created by its practices.

00126321.000

71.    Around September 13, 2022, Plaintiff purchased a Service Plan for his Whirlpool Range.

72.    Plaintiff paid $65.95 for his Service Plan. Plaintiff did not view the Service Contract pertaining to his Service Plan before finalizing his purchase – he did not see a link readily making this document available. Neither before nor immediately after completing his purchase was Plaintiff provided with a copy of the Service Contract.

73.    On September 13, 2022, Plaintiff received an email which confirmed his purchase, provided his Service Plan number, and stated "We will provide your plan documents to you via email within 3-5 business days, or . . . via United States Postal Service within 15 business days."

74.    The email also provided instructions for filing a claim which stated in pertinent part, "Before filing a claim, please note: If you purchased the Service Plan while your product is within the manufacturer's warranty coverage period, there will be NO WAIT PERIOD [to file a claim]."

75.    Around September 16, 2002, Plaintiff received an email from AIG transmitting Plaintiff's Service Contract. Under Plaintiff's Service Contract, the effective date for Plaintiff's Service Plan is September 13, 2022 – the date when he purchased the Service Plan.

76.    Along with the Service Contract, AIG sent Plaintiff a written notice in the form of the "Certificate of Coverage". (Attached hereto as Exhibit 5.)

77.    The Certificate of Coverage also provided the following instructions:

FOR SERVICE, CALL: 866-265-0028

Prior authorization is required before any service can be performed. Parts and service currently covered under the manufacturer's warranty will be provided by the manufacturer.

78.    Around January, 2023, Plaintiff's appliance malfunctioned while it was still covered under Whirlpool's original product warranty. Plaintiff called the number indicated on the Certificate of Coverage to get his appliance repaired.

CLASS ACTION COMPLAINT

00126321.000

Based on the representation on the Certificate of Coverage and the Whirlpool Websites, he was under the impression that he would receive the same level of service as any Whirlpool appliance owner submitting claims under Whirlpool's manufacturer's warranty.

79.     Unbeknownst to Plaintiff, the phone number on the Certificate of Coverage was for the Whirlpool department ("Whirlpool Service Plan Department") responsible for administering AIG's Service Plans – not the department ("Whirlpool Warranty Department") responsible for providing service under the manufacturer's warranty. Plaintiff thus booked a service visit through the Whirlpool Service Plan Department under the belief that the service he was getting was no different than what was provided under the manufacturer's warranty, which was still active.

80.     The service visit could only be scheduled during Plaintiff's work hours, so he took time off from work to meet the repair technician and lost the opportunity to earn income during this period.

81.     On the date of scheduled service, the service technician sent by the Whirlpool Service Plan Department serviced the appliance within the parameters that Defendants established for the Service Plan which are different from the service parameters provided under Whirlpool's manufacturer's warranty.

82.     Plaintiff's concerns about the product remained unresolved after the service visit. He then had to pay out-of-pocket for a repair person to visit his home and fix his appliance.

83.     But for Defendant's conduct, including their misrepresentations about the Service Plans, Plaintiff would have called the Whirlpool Warranty Department (not the Whirlpool Service Plan Department) and received service under a different standard which likely would have resulted in his appliance getting being repaired at no out-of-pocket costs to him.

CLASS ACTION COMPLAINT

00126321.000

84.    Plaintiff purchased the Service Plan based on the various representations made by Defendants without being aware of how the plan is actually administered by Defendants. Had Plaintiff known the full extent of Defendants' policies with regard to the Service Plans, he would have looked for other service plans, would not have purchased the Service Plan, or would have paid less to purchase the Service Plan.

## V.    CLASS ALLEGATIONS

85.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed Class, defined as follows:

> All persons who, at any time during the period beginning four years prior to the filing of this Complaint, purchased a Service Plan for an appliance that was domiciled in the State of California at the time they purchased a Service Plan.

86.    Excluded from the proposed Class are any officer or director of Defendants; any officer or director of any affiliate, parent, or subsidiary of Defendants; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

87.    **Numerosity.** Members of the proposed Class likely number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Defendants' own records.

88.    **Commonality and Predominance.** Common questions of law and fact exist as to all proposed Class members and predominate over questions affecting only individual Class members. These common questions include:

a.    Whether Defendants engaged in the wrongful conduct alleged herein;

b.    How Defendants generate, execute, and administer the Service Contracts;

CLASS ACTION COMPLAINT

00126321.000

c.    How Defendants market the Service Plan to the Class;

d.    Defendant's business policies and procedures for transmitting Service Contracts, Certificates of Coverage, and other documents to the Class;

e.    The relationship between the Service Plan terms that a reasonable consumer can expect based on Defendants' website representations of these plan and the actual terms of the Service Plan as they are provided in the Service Contracts;

f.    The relationship between the Service Plan terms as they are provided in the Service Contracts and how Service Plans are actually administered through Defendants' business practices;

g.    The difference in the economic value of the Service Plans (i) as the reasonable consumer would expect them to function based on Defendants' representations; (ii) as they should be functioning under the terms of the Service Contracts; and (iii) as they are provided to Class as a result of their being administered pursuant to Defendants' policies.

89.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, are less, in both quantity and quality, to the numerous questions that dominate this action.

90.    **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. All Class members were sold Service Plans pursuant to Service Contracts which were not made available to them in a readily identifiable manner and contained material terms that were either not fully and conspicuously disclosed or fully omitted. All Class members were sold Service Plans under representations that materially differed from the Service Plans described in their

00126321.000

Service Contracts and, from the way the Service Plans were administered by Defendants. Defendants' misconduct impacted the all Class members in the same manner. Individual variations in the damages that Defendants' conduct caused to each Class member, which might impact the awards due to each of them, can be addressed through rules, methods, and procedures that are the same for each Class member.

91.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

92.    **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

////

////

00126321.000

# VI.    CAUSES OF ACTION

## COUNT ONE
### BREACH OF CONTRACT
#### (On behalf of Plaintiff and the Class)

93.     Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

94.     Plaintiff entered into a Service Contract with AIG. The Class entered into Service Contracts with AIG.

95.     Plaintiff and the Class performed in compliance with all material terms of the Service Contract.

96.     The substantive terms of the Service Contracts as well as other relevant documents that Defendants seek to incorporate into the parties' agreement ("Agreement") with Plaintiff and with members of the Class is determined by AIG alone. The terms of the Service Contract are not subject to negotiation. Thus any ambiguity in the Agreements should be interpreted against AIG.

97.     AIG materially breached its obligations to Plaintiff and the Class by enforcing or allowing Whirlpool to enforce policies that are inconsistent with the Service Contract.

98.     In addition, the manner in which AIG enforces the Buyout provisions of the Service Plan or allows them to be enforced by Whirlpool constitutes a breach of AIG's duty of good faith and fair dealing in the performance and enforcement of the Agreement – a duty that California law imposes on each party to a contract. "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 965-66 (2015). (Internal citation omitted.) Under the Service Contract, AIG granted itself sole discretion to exercise the Buyout and Replacement options. To the extent that the Service Contract and other documents that Defendants made available to Plaintiff and Class before contract formation

-32-

00126321.000

discussed these options at all, they were described as devices that AIG may exercise at its discretion from time to time.[8] However, that is not the case. In reality, AIG exercises the Buyout option, or allows it to be exercised, systematically in order to increase its profits to the detriment of Plan purchasers. Defendants withhold from Plan purchasers the fact that AIG or the Administrator has an undisclosed policy to determine a Payout Limit for each Service Plan AIG enters into. AIG and/or Whirlpool utilizes this Payout Limit when exercising its sole discretion to pay for repairs under a policy or to exercise AIG's Buyout option and terminate the remaining term of these plans. AIG and/or the Whirlpool employ these undisclosed policies when exercising a contractual right that they have left to their sole discretion. Through these policies, they increase their profits to the detriment of Plaintiff and the Class. As such, AIG and Whirlpool breached their duty of good faith and fair dealing under the Agreements.

99.    Defendants made available repair services to Plaintiff and other Class members, but did so at a level of service that was inferior to what Plaintiff and Class members would have been able to obtain under Whirlpool's manufacturer's warranty. Nothing in the Service Contract put Plaintiff or the Class on notice that the Service Plan would provide them with a level of service below what is offered under Whirlpool's manufacturer's warranty even though this information was known to Defendants and was a factor within their control. Defendants' conduct against Plaintiff and other Class members constituted objectively unreasonable conduct that unfairly failed to meet the reasonable expectations of the Plaintiff and Class members as parties to the Service Contracts.

100.   Plaintiff and the Class were harmed by Defendants' conduct in that they overpaid for the Service Plans with the expectation that they would have

---

[8] Plaintiff alleges that he was neither shown nor received a copy of the Service Contract before purchasing the Service Plan.

access to appliance protection at a level of service above what was in fact available to them under the Service Plan.

101.   Plaintiff and the Class are entitled to a refund on the purchase price of each Service Plan they purchased, or alternatively a reimbursement which will compensate them for the discrepancy between the level of service they contracted to have available under their Service Plans and the level of service that was made available to them based on how Defendants administered the Service Plans.

## COUNT TWO

## VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT – CALIFORNIA (CLRA) CIVIL CODE § 1750 *et seq.*
## (On behalf of Plaintiff and the Class)

102.  Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

103.  The CLRA was enacted to protect consumers against unfair and deceptive business practices. It extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers. Defendants provided services to Plaintiff and the members of the class within the meaning of Cal. Civ. Code § 1761(b), and Defendants' acts, omissions, and practices as described herein fall under the CLRA.

104.  Under the CLRA, a "consumer" is defined as someone who purchases services for personal, family, or household purposes. *Id.* at § 1761(d). Plaintiff and Class Members are consumers under this definition.

105.  Each of the Defendants is a "person" providing "services" to "consumers" as part of a "transaction" as defined in Civil Code § 1761(a), (b), (c), (d) and (e).

106.  Defendants' material omissions and practices were and are likely to deceive consumers. Defendants were obligated to disclose material facts concerning how the Service Plans are administered and failed to do so, resulting

-34-

00126321.000

in their actions violating the CLRA. Defendants had exclusive knowledge of the following undisclosed material facts including but not limited to the facts that:

a.   Whether or not AIG will pay for a repair that is covered under a Service Plan is based on the Payout Limit that AIG and/or Whirlpool internally determines for the appliance;

b.   The Payout Limit is calculated and administered in a way that allows AIG to increase its profits to the detriment of Plan purchasers in that for two Plan purchasers who bought identical Service Plans to cover identical appliances and suffered identical appliance malfunctions, AIG may pay claims for one of the appliances but refuse to pay claims for the other appliance;

c.   When AIG and/or Whirlpool chooses to exercise the Buyout option, which requires AIG to issue a Payout to the Plan purchaser, the Administrator conditions this Payout payment upon Plan purchaser's acceptance of additional conditions that are not disclosed in the Service Contract; and

d.   Contrary to Defendants' representation of longer term Service Plans as offering better value to Plan purchasers, the implementation of AIG's and/or Whirlpool's undisclosed policies can result in Service Plans with shorter terms providing a better value.

107.   Defendants' misrepresentations about the Service Plans were and are likely to deceive consumers. These representations include:

a.   Communications that represent the Service Plans to Plan purchasers as an extension of Whirlpool's manufacturer's warranty.

b.   The Whirlpool Websites' representations which lead a

-35-

consumer to believe that the Service Plan offers " best-in-class service using factory certified parts and technicians" which is promoted with the promise "If We Can't Fix It – We Replace It" but fails to mention AIG's and/or Whirlpool's policy of using Buyout options to limit how much AIG will pay out under the Service Plan;

c.    The use of the phrase "If We can't Fix It – We Replace It" to create the perception that, unless an appliance is not repairable, it will be repaired even though that assertion is not correct because of the manner in which the Service Plans are administered by Defendants;

d.    The language in the "Compare the Savings" table on the Whirlpool Websites which  misleadingly suggests that AIG will fully pay for the repairs identified on the graphic but fails to disclose that the purported savings are not assured for most Plan purchasers due to AIG's and/or Whirlpool's undisclosed Payout Limits policy;

e.    Representations on the Whirlpool Websites that the plan offers "100% Factory Certified Parts and Technicians" which lead a reasonable consumer to believe that genuine Whirlpool parts will be used for the repairs even though the Exchange option gives AIG the right to exchange a covered appliance with a refurbished appliance which may contain non-original manufactured parts;

f.    Representations suggesting that the Service Plans have a level of service and coverage limit above what they really offer; and

g.    Representations that Service Plans with the 5-year term offer the best value even though Service Contracts that Defendants

00126321.000

market with shorter terms may in fact offer better value because of Defendants' ability to shorten the term of a Service Plan and extinguish a Plan purchaser's remaining benefits under the plan by exercising their Buyout option.

108.    AIG's and/or Whirlpool's policies are to represent the Service Plans as conferring them with rights they do not have and imposing obligations on Plan purchasers that do not exist under the Plan. These incorrect representations include:

    a.    Representations in the Buyout Letters informing Plan purchasers that, upon AIG's exercise of the Buyout option in the Service Contract, the Plan purchaser must fulfill the following requirements as conditions to receiving the Payout:

        i.    Agree to dispose of the non-working appliance in compliance with federal, state, and local laws at Plan purchaser's own expense and provide Administrator with an affidavit attesting to that fact;

        ii.    Sign a declaration stating AIG and/or Administrator have fulfilled all of their obligations under the parties Agreement; *and*

        iii.    Agree that he is authorizing AIG and/or Administrator to proceed with the "offered Buyout".

    b.    Communications informing Plan purchasers that their Service Plan offers them coverage while the "product is within the manufacturer's warranty coverage period" when offering such coverage is prohibited under the Song-Beverly Warranty Act. This prohibited act causes many Plan purchasers to submit their claims through the Service Plan rather than under the manufacturer's warranty and, as a result, receive inferior service.

-37-
CLASS ACTION COMPLAINT

109.   Defendants represented the Service Plans as conferring rights to Plan purchasers – such as the right to receive repairs of a covered repairable product for the term of the Service Plan – when Defendants knew these rights were illusory in that they could be freely extinguished by Defendants' decision to exercise the Buyout options.

110.   The aforementioned representations are all the more misleading because

a.   The Service Plans are marketed as offering consumers the protection to have their appliances repaired or replaced;

b.   Defendants knew or should have known that Plan purchasers would have purchased the Service Plans with the expectation that their repairable appliances would get repaired at no cost to them and, if their appliance is unrepairable, it would be replaced;

c.   AIG knew but withheld from Plan purchasers its intention to refuse to pay for the repair or replacement of Plan purchasers' non-working appliances;

d.   Defendants knew most Plan purchasers would not have a chance to review the Service Contract before purchasing a Service Plan; *and*

e.   AIG drafted the Service Contract in a manner that would prevent even consumers who took the time to read it from understanding AIG's and/or Whirlpool's policies with regard to how the Buyout options and Payout Limits are implemented.

111.   Defendants' omissions, misrepresentations, and practices alleged herein violated the following provisions of Cal. Civ. Code § 1770, which provides in relevant part:

CLASS ACTION COMPLAINT

00126321.000

(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…

(7) Representing that goods or services are of a particular standard, quality, or grade … if they are of another.

(14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

(17) Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

112.    Plaintiff relied on the misrepresentations and omissions by the Defendants and would not have purchased the Service Plan had Plaintiff known the true facts.

00126321.000

113.    Pursuant to Cal. Civ. Code § 1782, Plaintiff has notified Defendants in writing of the alleged violations of Cal. Civ. Code § 1770 and has demanded the same be corrected.

114.    Pursuant to CLRA, Plaintiff and the Class are entitled to receive actual monetary damages (not to be less than one thousand dollars in class action lawsuits), punitive damages, injunctive relief against Defendants' unfair and deceptive business practices or acts, and attorney's fees and costs. *Id.* at § 1780.

115.    Plaintiff does not seek damages on this claim at the time this Complaint is filed.  However, Plaintiff requests an order enjoining Defendants' methods, acts, and practices in conducting transactions in California in violation of the CLRA, the UCL, the Song-Beverly Warranty Act, the Magnuson-Moss Warranty Act, and California False Advertising Law, as well as attorney's fees and costs according to proof.

116.    Defendants continue to engage in the unlawful conduct described herein to the detriment of the members of the general public of the State of California, such that a public injunction prohibiting such conduct is appropriate.

117.    Plaintiff has provided notices to Defendants, contemporaneously with serving this Complaint, indicating particular alleged violations of § 1770 and demanded that they correct, repair, replace, or otherwise rectify the misconduct alleged to be in violation of § 1770.  The notices were given in writing and sent by certified mail, return receipt requested, to Defendants' corporate headquarters; Defendants do not have principal places of business in California. In the event that Defendants have not provided a satisfactory resolution of these claims, by operation of law and without leave of the Court this Complaint will be automatically amended to state a claim for damages pursuant to Civ. Code § 1782(d) upon the expiration of thirty days after the notice is given.

/////

/////

00126321.000

## COUNT THREE

### VIOLATIONS OF CIVIL CODE §1790, et seq.

#### (On behalf of Plaintiff and the Class)

118.   Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

119.   Civil Code §1790, *et. seq*., also known as the Song-Beverly Warranty Act ("Song-Beverly"), mandates that service contracts contain "clear and conspicuous statements . . . [of] any services, . . . repairs, or remedies that are excluded from the scope of the service contract." Civ. Code § 1794.4(c)(5)(A).

120.   Civil Code § 1794.4(c)(5)(B) requires equally clear and conspicuous statements to be included in the service contract if it imposes any other limits to the service contract provider's obligations which are defined in § 1794.4(b) as: "every service contract shall obligate the service contractor to provide to the buyer of the product all of the services and functional parts that may be necessary to maintain proper operation of the entire product under normal operation and service for the duration of the service contract and without additional charge."

121.   "'Clear and conspicuous' and 'clearly and conspicuously' means a larger type than the surrounding text, or in a contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Civ. Code § 1791(u).

122.   The Service Contract provisions limiting Defendants' obligations to "maintain proper operation of the entire product under normal operation and service for the duration of the service contract and without additional charge" are not clearly and conspicuously disclosed as required by the Song-Beverly Act.

123.   These provisions, pursuant to which Defendants exercise the Buyout options and limit their obligation to provide the repairs that keep the product operational during the term of the Service Plan, are not capitalized, underlined,

bolded, or written in a different size font. And they are not set off from the surrounding text in a way to make them stand out.

124.  These provisions are written in the same font as most of the other provisions of the Service Contract, and not like certain other provisions in the Service Contract that are written in bold and sometimes also capitalized. Moreover, the Service Contract communicates the limits to Defendants' contractual obligations in piece-meal fashion by spreading the information over multiple sections with innocuous sounding names such as "6. OBLIGATION FULFILLED", "11. SERVICE EVENT", and "14. EXCHANGE OR BUYOUT" that must be read together to understand how these limitations work. To further complicate the matter, the Service Contract contains pertinent sounding but less relevant sections with headings like "18. EXCLUSIONS" which are printed in bold but do not discuss the limitations hereinabove alleged. Amidst all this subterfuge, even a careful reviewer of the Service Contract can easily miss the limitations Defendants have hidden in the Service Contract. And no matter how carefully the Service Plan is read and understood, literally every Plan purchaser would have no way of knowing about the secret Payout Limit assigned to each Service Plan or of the additional conditions precedent imposed upon Plan purchasers to receive any Buyout.

125.  Civil Code §1794.41(a)(2) requires that the service contract be available for inspection by the buyer prior to purchase and "either the contract, or a brochure which specifically describes the terms, conditions, and exclusions of the contract, and the provisions of this section relating to contract delivery, cancellation, and refund, shall be delivered to the buyer at or before the time of purchase of the contract."

126.  Before purchasing the Service Plan, Plaintiff was not shown the Service Contract or given an easy way to locate and review it. After completing his purchase, Plaintiff received an email confirming his purchase but did not

CLASS ACTION COMPLAINT

receive a Service Contract until several days later. Nor was Plaintiff given any other documents upon purchase which specifically described the terms, conditions, and exclusions from the Service Plan. As such, Defendants delivery of the Service Contract to Plaintiff violated Civ. Code §1794.41(a)(2).

127.    Civil Code § 1794.41(a)(3) states that the Service Contract is "applicable only to items, costs, and time periods not covered by the express warranty. However, a service contract may run concurrently with or overlap an express warranty if (A) the contract covers items or costs not covered by the express warranty or (B) the contract provides relief to the purchaser not available under the express warranty, such as automatic replacement of a product where the express warranty only provides for repair."

128.    The Service Plan violates Civ. Code § 1794.41(a)(3) because it overlaps Whirlpools' one-year express warranty without covering costs not covered by the express warranty or providing relief not available under the express warranty. In fact, the Service Plan is inferior to the manufacturer's warranty for the reasons alleged in this complaint. Because the Service Plan is inferior to the manufacturer's warranty, and because Defendants' business practices steer Plan purchasers to the Whirlpool Service Plan Department even when a Plan purchaser is still covered under the original manufacturer's warranty offering superior coverage, Defendants' violations of the statute cause harm to consumers.

129.    Plaintiff suffered harm when he called the Whirlpool Service Plan Department number that was provided to him in the Service Plan Order Confirmation he received. As a result, he ended up with an inferior service that did not resolve his concerns and left him having to pay out of pocket to an independent repair person to make the repairs.

/////

/////

/////

00126321.000

## COUNT FOUR

## VIOLATIONS OF BUSINESS & PROFESSIONS CODE §17200, et seq.
## (On behalf of Plaintiff and the Class)

130.   Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

131.   Under Bus. & Prof. Code § 17200, *et seq*., (the "UCL") unfair competition includes any "unlawful," "unfair," or "fraudulent" business act or practice and any "unfair, deceptive, untrue or misleading advertising."

132.   The UCL authorizes equitable relief for conduct that constitutes unfair competition.  Bus. & Prof. Code § 17203.

### DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

133.   A business act or practice is "unlawful" under Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL") if it violates any other law or regulation.

134.   As alleged herein, Defendants violated the Consumers Legal Remedies Act and the Song-Beverly Warranty Act.

Violations of Cal. Bus. & Prof. Code, Section 17500, *et. seq.*

135.   Defendants' conduct violated California Business and Professions Code, Section 17500, *et. seq.*, which provides in pertinent part as follows:

It is unlawful for any person, firm, corporation or association,
... with intent directly or indirectly to ... perform services, ... or
to induce the public to enter into any obligation relating thereto,
to make or disseminate or cause to be made or disseminated
before the public in this state, or to make or disseminate or
cause to be made or disseminated from this state before the
public in any state, in any ... publication, ..., including over the
Internet, any statement, concerning ... those services, ... or
concerning any circumstance or matter of fact connected with

-44-

00126321.000

the proposed performance or disposition thereof, which is

untrue or misleading, and which is known, or which by the

exercise of reasonable care should be known, to be untrue or

misleading, or for any person, firm, or corporation to so make

or disseminate or cause to be so made or disseminated any such

statement as part of a plan or scheme with the intent not to sell

... those services, ... as so advertised.

136.    As alleged in this Complaint, Defendants published or caused to be published on the Whirlpool Websites statements concerning the Service Plans which are untrue or misleading in that they differ from the benefits provided under the Service Contract and further differ from how the Service Plans are administered by Defendants.

137.    Defendants knew or should have known that these statements were likely to mislead the public into thinking the Service Plans offer greater benefits to Plan purchasers than they actually do and purchasing Service Plans with longer plan terms under the misperception that these plans offered a better value than Service Plans that were offered at lower prices.

138.    These statements were made with the intent to perform services or to induce the public to enter into an obligation to purchase the Service Plans.

139.    Moreover, Whirlpool has been made aware of complaints concerning the claims that the AIG advertising was misleading and fraudulent since 2017. There are numerous blog posts by angry consumers who have claimed they were cheated by Defendants' service contract business practices. Some of these consumers appealed directly to Whirlpool for relief, which was denied or ignored.

/////

/////

/////

CLASS ACTION COMPLAINT

00126321.000

## **DEFENDANTS' UNFAIR BUSINESS AND ADVERTISING PRACTICES**

140.   Defendants committed acts of unfair competition as defined by, and in violation of Bus. and Prof. Code § 17200 by the following acts which are more fully alleged above:

    a.   Marketing and promoting Service Plans to consumers with language that is likely to create the misperception that the Service Plans

        i.   Are offered by Whirlpool;

        ii.   Provide benefits that are comparable to, and provide as comprehensive protection as, Whirlpool's manufacturer's warranty;

        iii.   Will be administered in a way that is different from how they are actually administered. (For example Defendants' use of the phrases "No Deductible" and "If We Can't Fix It – We Replace It" suggest that a covered appliance will – without additional costs to the consumer – either be repaired or replaced when, in fact, Defendant' position is that they are not bound by such a promise and Defendants' business practices are to refuse to repair or replace a covered appliance through the use of their undisclosed Payout Limits which cap the amount they will pay to a consumer whose appliance Defendants choose not to fix at 75% of the purchase price for that appliance.)

    b.   Profiting from promoting and selling certain plans to California consumers at higher prices under the misrepresentation that they offer greater value than Defendants' shorter term plans which cost less;

00126321.000

c.      Inducing consumers to purchase Service Plans without
        providing them with the full terms and conditions governing
        such plans;

d.      Using vague contractual language that fails to provide
        consumers with adequate notice about how AIG and/or
        Administrator actually administer the Service Plans through
        their business policies such as their use of Payout Limits;

e.      Using complex contractual language and nested contract
        provisions in Service Contracts that prevent potential
        customers from understanding the limited scope of the Service
        Plan benefits;

f.      Systematically exercising their Buyout and Exchange options
        to prematurely terminate coverage for Service Plans;

g.      Marketing and promoting Service Plans to consumers with
        language that is likely to create the misperception that the
        Service Plans are offered by Whirlpool;

h.      Taking advantage of the consumer confusion created about the
        source of the Service Plans by sending service request
        instructions that cause policyholders whose appliances are still
        under the original manufacturer's warranty to contact the
        Whirlpool Service Plan Department where they receive inferior
        levels of service than what such policyholders would have
        otherwise received;

/////
/////
/////
/////
/////

-47-
CLASS ACTION COMPLAINT

00126321.000

i. Implementing business practices that diminish the value of the Service Plans beyond what policyholders bargained for through such policies as the requirement that, upon AIG's and/or Administrator's decision to exercise a Buyout option, policyholders must comply with extra-contractual obligations or forego the contractual rights under the Service Contracts.

## DEFENDANTS' FRAUDULENT BUSINESS AND ADVERTISING PRACTICES

141. The misrepresentation and omissions alleged above constitute fraudulent business practices.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of himself and all others similarly situated, respectfully request the Court enter an order:

a. Certifying the proposed Class as requested herein;

b. Appointing Plaintiff as Class Representative and the undersigned counsel as Class Counsel;

c. Finding that Defendants engaged in unlawful conduct as alleged herein;

d. Awarding Plaintiff and Class Members appropriate monetary relief, including damages and punitive damages;

e. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest on all amounts awarded;

f. Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses;

g. Declaring as void all Buyout Letters signed by any member of the Class during the Class Period;

/////

00126321.000

h.   Enjoining Defendants from the unlawful and unfair practices alleged herein;

i.   Requiring Defendants to pay the costs involved in notifying the Class members about the judgment and administering the claims process; *and*

j.   Granting such other relief as the Court deems just and proper.

DATED:  August 2, 2023          **GREEN & NOBLIN, P.C.**

By: */s/ Emrah M. Sumer*
     Emrah M. Sumer

Robert. S. Green
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email: gnecf@classcounsel.com

Attorneys for Plaintiff
ORLANDO SALAS

-49-

CLASS ACTION COMPLAINT

00126321.000