RACHEL E. K. LOWE (State Bar No. 246361)
ETHAN J. BOND (State Bar No. 316532)
**ALSTON & BIRD LLP**
333 South Hope Street, 16th Floor
Los Angeles, CA 90071-1410
Telephone:  213-576-1000
Facsimile:   213-576-1100
E-mail:      rachel.lowe@alston.com
             ethan.bond@alston.com

Attorneys for Defendant
AIG WARRANTYGUARD, INC.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORLANDO SALAS, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>WHIRLPOOL CORPORATION and AIG WARRANTYGUARD, INC.,<br><br>    Defendants. | Case No. 5:23-CV-01549-AB-KK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS COMPLAINT**<br><br>[Filed concurrently with Motion to Dismiss; Request for Judicial Notice; Declaration of Ethan J. Bond; [Proposed] Order]<br><br>Hearing Date: December 8, 2023<br>Hearing Time: 10:00 a.m.<br>Courtroom: 7B |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................... 2

III.  LEGAL STANDARD ................................................................................ 5

IV.   ARGUMENT............................................................................................. 5

      A.   Salas Lacks Standing to Sue. ......................................................... 5

           (1)  Salas Lacks Article III Standing Because He Has Not Pled
                Any Concrete Injury ............................................................. 6

           (2)  Salas Lacks Standing to Seek Injunctive Relief ................... 7

           (3)  Salas Lacks Statutory Standing to Sue Because He Was Not
                Injured by AIGWG's Alleged Statutory Violations. ........... 8

      B.   Salas Fails to State a Claim for Breach of Contract (Count One). ........... 9

           (1)  Salas Fails to Plead that AIGWG Breached Any Provision........... 9

           (2)  Salas fails to Plead any Resulting Damages. ...................... 11

      C.   Salas Fails to State a Claim for Violations of the Song-Bervely Act
           (Count Three). ......................................................................... 11

           (1)  Salas Agreed that he Read the Contract Terms that AIGWG
                provided him Before Purchase Per Judicially Noticeable
                Facts. ................................................................................ 11

           (2)  The Service Contract Did Not Impermissibly Overlap with
                the Manufacturer's Warranty.............................................. 14

           (3)  The Service Exclusions Were "Clear and Conspicuous" .............. 15

           (4)  Salas Does Not Allege that any (Non-Existent) Technical
                Violation of Song-Bervely Caused Him Harm............................. 17

D.   Salas Fails to State a Claim for Violations of the CLRA or UCL (Counts Two and Four). ..............................................................18

    (1)   Salas Does Not Plead His Claims with Particularity. ...................18

    (2)   Salas Cannot Use the UCL to Change the Parties' Bargain ..........19

    (3)   Salas Fails to State a Claim Under the UCL's "Unlawful" Prong ........................................................................................20

    (4)   Salas Fails to State a Claim for Violation of UCL's "Unfair Prong" .......................................................................................21

    (5)   Salas Does Not Allege Facts that AIGWG Violated the CLRA. ........................................................................................22

E.   The Express Terms of the Service Contract Bar Salas from Recovering Out-of-Pocket Expenses or Consequential Damages. ...........23

F.   Leave to Amend is Futile. .......................................................................25

V.   CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................5

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007) ...................................................................5

*Birdsong v. Apple, Inc.*,
590 F.3d 955 (9th Cir. 2009) ...................................................................7

*C.f. Petzshke v. Century Aluminum Co. (In re Century Aluminum Co. Sec. Litig.)*,
729 F.3d 1104 (9th Cir. 2013) ...............................................................21

*Cafasso ex. rel. United States v. Gen. Dynamics C4 Sys.*,
637 F.3d 1047 (9th Cir. 2011) ...............................................................19

*Chulick-Perez v. CarMax Auto Superstores Cal., LLC*,
2014 WL 2154479 (E.D. Cal. May 22, 2014) .......................................18

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).....................................................................................7

*Cork v. CC-Palo Alto, Inc.*,
534 F. Supp. 3d 1156 (N.D. Cal. 2021)..................................................22

*Hansen v. Marin Gen. Hosp.*,
2019 WL 1509182 (N.D. Cal. Apr. 5, 2019)..........................................10

*Herremans v. BMW of N. Am., LLC*,
2014 WL 5017843 (C.D. Cal. Oct. 3, 2014) ....................................18, 23

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) .................................................................21

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) .................................................................6

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ...............................................................19

*Lassen v. Nissan N. Am., Inc.*,
   211 F. Supp. 3d 1267 (C.D. Cal. 2016) ................................................................. 9

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................ 6

*Manchester v. Sivantos GMBH*,
   2019 WL 3734307 (C.D. Cal. Aug. 7, 2019) ......................................................... 9

*Martinez v. Ford Motor Co.*,
   2022 WL 14118926 (S.D. Cal. Oct. 24, 2022) .............................................9, 20, 21, 22

*Meisner v. JPMorgan Chase Bank, N.A.*,
   2022 WL 837230 (E.D. Cal. Mar. 18, 2022) ....................................................... 14

*Mohamed v. Kellogg Co.*,
   2015 WL 12469107 (S.D. Cal. Aug. 19, 2015) ...................................................... 7

*Naseri v. Greenfield World Trade, Inc.*,
   2021 WL 3511040 (C.D. Cal. Aug. 10, 2021) ....................................................... 8

*Quattrocchi v. Allstate Indem. Co.*,
   2018 WL 347779 (E.D. Cal. Jan. 8, 2018) .......................................................... 19

*Raifman v. Wachovia Sec., LLC*,
   2012 WL 1611030 (N.D. Cal. May 7, 2012) ........................................................ 25

*Sanbrook v. Office Depot, Inc.*,
   2009 WL 840020 (N.D. Cal. Mar. 2009) ........................................................ 12, 13

*Santa Barbara Smokehouse, Inc. v. AquaChile, Inc.*,
   2020 WL 6743592 (C.D. Cal. July 7, 2020) ........................................................ 18

*Shroyer v. New Cingular Wireless Servs.*,
   622 F.3d 1035 (9th Cir. 2010) ....................................................................... 20, 21

*Steele v. GM LLC*,
   2018 WL 6039838 (C.D. Cal. Aug. 8. 2018) ...................................................... 22

*Stover v. Experian Holdings, Inc.*,
   978 F.3d 1082 (9th Cir. 2020) ............................................................................... 8

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ................................................................................. 5

*Van Buskirk v. CNN,*
    284 F.3d 977 (9th Cir. 2002) ................................................................5

*Von Grabe v. Sprint PCS,*
    312 F. Supp. 2d 1285 (S.D. Cal. 2003) .................................15, 16, 17

*Walker v. McCloud Cmty. Servs. Dist.,*
    2016 WL 951635 ..............................................................................23, 24

**STATE CASES**

*Kwikset Corp. v. Super. Ct.,*
    51 Cal. 4th 310 (2011) ..........................................................................8

*Oasis W. Realty, LLC v. Goldman,*
    51 Cal. 4th 811 (2011) ..........................................................................9

*Rosenbluth Int'l v. Superior Court,*
    101 Cal. App. 4th 1073 (2002) ...........................................................20

*Sellers v. JustAnswer LLC,*
    73 Cal. App. 5th 444 (2021) ...............................................................13

**STATE STATUTES**

Cal. Civ. Code § 1770(a)(5)........................................................................22

Cal. Civ. Code § 1791(u) ....................................................................11, 16

Cal. Civ. Code § 1794(a) ............................................................................11

Cal. Civ. Code § 1794.4 ..............................................................................16

Cal. Civ. Code § 1794.4(c)(5)(A-B) ....................................................11, 15

Cal. Civ. Code § 1794.41(a)(2) ...........................................................11, 13

Cal. Civ. Code § 1794.41(a)(3) ....................................................11, 14, 15

California False Advertising Law...............................................................23

Song-Beverly Act ................................................8, 11, 14, 15, 17, 20

**RULES**

Fed. R. Civ. P. 8(a) ......................................................................................5

Fed. R. Civ. P. 12(b)(1) ........................................................................ 5

Fed. R. Civ. P. 12(b)(6) ................................................................. 5, 23

Local Rule 7-3 ...................................................................................... 12

Rule 9(b) ....................................................................................... 18, 19

Rule 12(f) ............................................................................................. 24

## I.    <u>INTRODUCTION</u>

On July 21, 2022, Plaintiff Orlando Salas bought a Whirlpool range that later needed repairs.  Unhappy with the quality of service he received, Salas filed this class-action complaint against Defendants AIG Warrantyguard, Inc. ("AIGWG") and Whirlpool Corporation on behalf of himself and a putative class of California home-appliance purchasers who Salas alleges were deceived into purchasing extended-warranty service contracts that were inferior to the original manufacturer warranty.

Salas lacks standing to bring the case because the allegations have largely nothing to do with him; Salas does not plead that he suffered a concrete injury or that AIGWG caused it.  The crux of Salas's Complaint is that Defendants allegedly concocted a secret payout scheme to deceive purchasers out of the true value of their products by systematically buying out those products below their fair value rather than repairing them.  Compl. ¶¶ 8-10, 47, 59-61, 66, 98, 106(a), 106(b), 107(d), 110(e), 124, 140(a)(iii), 140(d).  Those (false) allegations fail for many reasons, including that they have nothing to do with Salas because he does not allege a buyout.  On the contrary, *he alleges that his range was repaired*.  In any event, the service contract that Salas attached to the Complaint expressly discloses the buyout terms.  That is just one example showing why Salas lacks standing.  There are others.

While the Complaint spans some forty-eight pages, Salas fails to state any claim against AIGWG.  By way of example, Salas sued AIGWG for breach of contract, yet he does not identify even one provision that AIGWG breached.  That's because his case has nothing to do with breach of contract.  In reality, Salas brings a deception claim based on AIGWG's allegedly hiding the buyout option from him.  But again, that option is an *express term* in the contract.  Salas had at least *five chances* to read it before purchase.  And, he *agreed* that he read the terms before purchasing via an enforceable online click-through agreement – i.e., he was required to click a button certifying that he read the contract.  The Court can take judicial notice of those facts.  The contract also contains a "free look" provision, so even if Salas somehow missed

the terms that he certified he read, he could have canceled after the contract was delivered.  There was no deception.  Salas simply does not like his bargain and is trying to use consumer-protection laws to change the deal.  Per binding precent, that is not allowed under California law.  Those are just some of the many reasons that Salas's Complaint is incurably defective.  There are other reasons detailed in this brief.

*First*, Salas lacks Article III and statutory standing to bring the case.  *Second*, Salas does not (and cannot) identify a single provision in the service contract that AIGWG breached, so he fails to state a breach of contract claim.  *Third*, Salas's Song-Beverly claim fails as a matter of law because AIGWG made the contract terms available to Salas pre-purchase, he agreed he read them, the contract's exclusions are sufficiently "clear and conspicuous," and the contract does not impermissibly overlap with the original manufacturer warranty.  *Fourth*, Salas's CLRA and UCL claims fail as a matter of law because the underlying allegations fail the applicable pleading standards and do not meet the elements of either claim, among other reasons.  And *fifth*, the plain language in the service contracts—which Salas attaches to the Complaint—bars Salas from at least some of the recovery he seeks.

This Court should dismiss the Complaint with prejudice.  Amendment would be futile because Salas has no standing to bring the case and the contract itself precludes Salas's theories of liability.

## II.   **FACTUAL BACKGROUND**

Salas alleges that on July 21, 2022, he bought a Whirlpool range that included a one-year manufacturer's warranty issued by Whirlpool.  Compl. ¶¶ 4, 37, 67.  A month later, Salas allegedly received a Whirlpool marketing email urging him to purchase an extended-warranty service plan.  Compl. ¶ 68.  On September 13, 2022, Salas allegedly bought a one-year, extended-warranty service plan (the "Service Contract")—which he attached to the Complaint as Exhibit 1—under which Whirlpool is the "administrator" and AIGWG is the "obligor."  Compl. ¶ 71; Compl. Ex. 1.  AIGWG then emailed Salas a certificate of coverage—attached to the

Complaint as Exhibit 5—confirming that the Service Contract would take effect on July 1, 2023 and expire on June 30, 2024.  Compl. ¶ 73; *id.* Ex. 5.

In January 2023, while Whirlpool's manufacturer warranty was in effect and before the Service Contract took effect, Salas's range allegedly malfunctioned. Compl. ¶ 78.  He allegedly called the number on the certificate of coverage, rather than the Whirlpool manufacturer warranty number, to request a repair.  Compl. ¶ 78. As a result, he allegedly received a service visit from Whirlpool's "Service Plan" department, which is allegedly responsible for administering the Service Contract, rather than a visit from Whirlpool's "Warranty Department," which allegedly handles repairs under Whirlpool's manufacturer warranty.  Compl. ¶ 79. Whirlpool's service plan department allegedly sent a technician, who "serviced the appliance within the parameters that Defendants established for the Service Plan." Compl. ¶¶ 79, 81.  Those service parameters are allegedly different than, and inferior to, those under Whirlpool's manufacturer warranty (Compl. ¶¶ 81-83), which was still in effect at the time Whirlpool serviced the range.  Compl. ¶ 78.  Salas allegedly "took time off from work to meet the repair technician and lost the opportunity to earn income during this period."  Compl. ¶ 80.  Nevertheless, Salas alleges that his "concerns about the product remained unresolved after the service visit," so he allegedly paid a third-party repair person to fix his appliance.  Compl. ¶ 82.

Salas alleges that but for "Defendants' . . . misrepresentations about the Service Plans," Salas "would have called the Whirlpool Warranty Department (not the Whirlpool Service Plan Department) and received service under a different standard which likely would have resulted in his appliance getting being [sic] repaired at no out-of-pocket costs to him."  Compl. ¶ 83.  Those "misrepresentations," Salas alleges, are found on the "Whirlpool Websites"—*five websites*[1] that Whirlpool "owns and operates."  Compl. ¶ 34.  Salas does not allege

---

[1]      www.amana.com,      www.jennair.com,      www.kitchenaid.com, www.maytag.com, and www.whirlpool.com

1    that AIGWG owns or operates the Whirlpool Websites.  He alleges, however, that

2    AIGWG "allows its Service Plans to be sold through the Whirlpool Websites" and

3    "receives financial benefits from its collaboration with Whirlpool on the marketing

4    and sale of Service Plans to consumers."  Compl. ¶¶ 66(a), (i).

5         The purported false representations found on the Whirlpool Websites

6    allegedly include that the service plans offer "100% Factory Certified Parts and

7    Technicians" even though "AIG[WG]" allegedly has the right to swap a covered

8    appliance with a refurbished appliance (Compl. ¶ 107(e)), that the service plans are

9    a mere extension of the Whirlpool manufacturer warranty when in fact they are

10   inferior (Compl. ¶¶ 3, 4, 107(a), 136, 140(a), 140(g)), and "If We can't Fix it – We

11   Replace It" (Compl. ¶¶ 107(b), (c)).

12        Salas also alleges that "Defendants" "[t]ak[e] advantage of the consumer

13   confusion created about the source of the Service Plans by sending service request

14   instructions that cause policyholders whose appliances are still under the original

15   manufacturer's warranty to contact the Whirlpool Service Plan Department where

16   they receive inferior levels of service than what such policyholders would have

17   otherwise received."  Compl. ¶ 140(h).  He further alleges that AIGWG falsely

18   represented that its long-term service plans provide better value than its short-term

19   ones (Compl. ¶¶ 106(d), 107(g), 137, 140(b)) and that AIGWG did not make the

20   Service Contract terms available before he bought it.  Compl. ¶ 72. Had Salas known

21   "the full extent of Defendants' policies with regard to the Service Plans," Salas

22   allegedly "would have looked for other service plans, would not have purchased the

23   Service Plan, or would have paid less to purchase the Service Plan."  Compl. ¶ 84.

24        Finally, Salas devotes a significant portion of the Complaint to allegations

25   that "Defendants" employ a secret business practice to establish a dollar limit, which

26   Salas calls a "Payout Limit," that determines how much they will pay to repair or

27   replace an appliance under the service plan.  Compl. ¶¶ 8-10, 47, 59-61, 66, 98,

28   106(a), 106(b), 107(d), 110(e), 124, 140(a)(iii), 140(d).  Salas alleges that if the costs

exceed that secret Payout Limit, "Defendants" systematically exercise their contractual option to "buy out" the appliance in cash rather than repair it. *Id.* The buyout terms appear in Section 14 of the Service Contract. Compl. Ex. 1. Those terms, which Salas agreed to, expressly disclose the buyout depreciation schedule. *Id.* But the buyout option allegedly "does not provide the Plan purchaser with sufficient compensation to repair his appliance or to purchase a replacement." Compl. ¶ 9. That practice, which we refer to in this brief as the "Payout Scheme" is allegedly an "integral part of [AIGWG's] business model." Compl ¶ 59(d). Salas does not allege that AIGWG exercised the Payout Scheme as to *his* range; on the contrary, *he alleges that his range was repaired*. Compl. ¶¶ 81-83.

## III.   <u>LEGAL STANDARD</u>

A district court must dismiss a complaint if it lacks subject matter jurisdiction to hear the claims alleged in the complaint. Fed. R. Civ. P. 12(b)(1). "Standing is a threshold matter central to our subject matter jurisdiction." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it fails to state a claim upon which relief can be granted. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a). Formulaic recitations of causes of action with conclusory allegations are not sufficient; rather, a plaintiff must plead facts showing that a violation is not merely possible but plausible. *Iqbal,* 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007)). When deciding a Rule 12(b)(6) motion, courts may consider not only the complaint's allegations but also its exhibits and documents incorporated by reference. *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002).

## IV.   <u>ARGUMENT</u>

### A.   **Salas Lacks Standing to Sue.**

As a threshold matter, Salas lacks Article III standing to bring many of his allegations (which affect all his claims) and to seek injunctive relief. He also lacks

statutory standing to bring his CLRA, Song-Beverly, and UCL claims.

(1) *Salas Lacks Article III Standing Because He Has Not Pled Any Concrete Injury.*

"To have standing under Article III, a plaintiff must have (1) a concrete and particularized injury that (2) is caused by the challenged conduct. . . ." *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020). The plaintiff bears the burden of pleading facts sufficient to support a finding of Article III standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Salas lacks Article III standing to sue AIGWG because he cannot show that his claimed injury was caused by AIGWG's alleged conduct. In fact, AIGWG's alleged conduct has nothing to do with Salas. The crux of the Complaint is that AIGWG allegedly participated in a nefarious "Payout Limit" scheme to defraud purchasers from realizing the full value of their products. Compl. ¶¶ 8-10, 16-17, 47, 55-56, 59, 61, 66, 98, 106, 108, 110, 124, 140. According to Salas, "Defendants regularly choose to issue a Payout rather than to repair or replace a covered appliance even when this option does not provide the Plan purchaser with sufficient compensation to repair his appliance or to purchase a replacement." *Id.* ¶ 9. Those allegations are false and not pled with anything approaching particularity (as explained in Section IV.D.1 below), and the payout limits are in the Service Contract. Compl. Ex. 1 § 14. But even taking the allegation as true, Salas never alleges that Defendants bought out *his* range. On the contrary, *Salas alleges that his range was repaired* (Compl. ¶¶ 81-82), so Salas cannot trace that alleged conduct of AIGWG to his claimed injury, and he therefore lacks standing to pursue any claim based on the alleged Payout Scheme.

The same is true of other allegations, including at least the following. Salas alleges that Defendants improperly forced customers to dispose of bought-out products (Compl. ¶¶ 16, 17, 59, 108), but Salas does not allege that Defendants bought out *his* range or forced *him* to dispose of it. Salas also alleges that Defendants falsely represent that their long-term service plans provide better value than their short-term

service plans (Compl. ¶¶ 106(d), 107(g), 137, 140(b)), but according to the certificate of coverage attached to the Complaint (Ex. 5), Salas purchased a one-year service plan—*the shortest available*—so Salas cannot show that he was duped into purchasing a long-term service plan.   Salas also alleges that Defendants falsely represented that the service plans offer "100% Factory Certified Parts and Technicians" even though they have the right to swap a covered appliance with a refurbished appliance (Compl. ¶ 107(e)), but Salas does not allege that Defendants swapped his range for a refurbished range.   Salas also alleges that Whirlpool (*but not AIGWG*) falsely represented, "If We can't Fix it – We Replace It" (Compl. ¶¶ 107(b), (c)), but Salas does not allege that Whirlpool couldn't fix his range or failed to offer a replacement.

Because those allegations have nothing to do with Salas, he cannot show that AIGWG caused his claimed injury, so he lacks standing to sue.   *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 956-57, 961 (9th Cir. 2009) (dismissing UCL claim for lack of Article III standing in warranty context where the plaintiffs failed to plead a concrete injury to themselves); *see also Mohamed v. Kellogg Co.*, 2015 WL 12469107, at *5 (S.D. Cal. Aug. 19, 2015).

### (2)   *Salas Lacks Standing to Seek Injunctive Relief*

Salas also lacks Article III standing to seek injunctive relief.   Compl. ¶¶ 114, 116.   Salas does not (and cannot) allege that AIGWG caused him any harm, so he could never demonstrate that AIGWG is likely to cause him the same "harm" a second time.   But that is exactly what Article III requires.   Where standing is premised on the threat of repeated injury, the plaintiff must show not only an actual and imminent injury, but also a "sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983).   Salas cannot allege that he is likely to be similarly "wronged" by AIGWG in the future.   That is especially true because he alleges that his range was repaired.   Compl. ¶ 82.   Salas thus lacks standing to seek injunctive relief, including public injunctive relief.   Compl. ¶ 116;

*see Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1087 (9th Cir. 2020) ("[T]o seek public injunctive relief in federal court, [the plaintiff] must . . . allege that she has Article III standing.").

### (3)    *Salas Lacks Statutory Standing to Sue Because He Was Not Injured by AIGWG's Alleged Statutory Violations.*

For similar reasons, Salas additionally lacks statutory standing (which is "substantially narrower" than Article III standing (*Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322, 324 (2011)) to sue under the Song-Beverly Act (Count 3), the CLRA (Count 2), and the UCL (Count 4).

"Under all three statutes, only someone who has been damaged by the failure to comply with the statute may bring suit." *Naseri v. Greenfield World Trade, Inc.*, 2021 WL 3511040, at *2 (C.D. Cal. Aug. 10, 2021).  "Under the Song-Beverly Act, only a buyer of consumer goods *who is damaged* by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." *Id*. (citing Cal. Civ. Code § 1794(a)).  "Under the CLRA, [a]ny consumer *who suffers any damage* as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person." *Id.* (citing Cal. Civ. Code § 1780).  And under the UCL, following the passage of Proposition 64, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact . . . , and (2) show that that economic injury was the result of . . . the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset*, 51 Cal. 4th at 322.

Salas does not have standing to bring his Song-Beverly, CLRA, or UCL claims because he does not (and cannot) allege that AIGWG caused him "damage[] by [its alleged] failure to comply with th[ose] statute[s]." *Naseri*, 2021 WL 3511040, at *2. For the reasons explained throughout this brief, Salas could not have suffered any damages, losses, deprivation of money, or economic injury as a result of AIGWG's

alleged conduct because that conduct had nothing to do with Salas. *See Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1283 (C.D. Cal. 2016).

### B.    Salas Fails to State a Claim for Breach of Contract (Count One).

This Court should dismiss Salas's breach of contract claim because he did not plead essential elements of the claim, namely that AIGWG failed to perform any provision in the contract, or that AIGWG's (unpled) breach caused Salas harm for which AIGWG can be held liable.  Indeed, Salas doesn't identify a *single* provision in the Service Contract that AIGWG allegedly breached.[2]

Under California law, to establish a breach of contract, Salas was required to allege that (1) the parties had a contract, (2) Salas performed, (3) AIGWG did not perform, and (4) AIGWG's nonperformance caused Salas harm.  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  "Causation resulting in damage is an essential element of a claim for breach of contract." *Manchester v. Sivantos GMBH*, 2019 WL 3734307, at *3 (C.D. Cal. Aug. 7, 2019) (citation omitted).

### (1)    Salas Fails to Plead that AIGWG Breached Any Provision.

Even if coverage under the Service Contract was in effect when Salas's range allegedly malfunctioned (and it was not, as explained in Section IV.C.2 below), Salas's breach of contract claim fails at the threshold because Salas does not allege what provision in the Service Contract AIGWG breached and how AIGWG failed to perform—an essential element of breach of contract.[3]  Although Salas focuses on the alleged Payout Scheme (which has nothing to do with him), he never explains what

---

[2] Salas also alleges that AIGWG breached its duty of good faith and fair dealing because of the "manner in which AIG[WG] enforces the Buyout provisions."  Compl. ¶ 98.  As explained throughout this brief, Salas has no standing to challenge the Buyout provision, which in any event is an express term in the Service Contract that Salas certified he read and had no less than 30 days (and up to 60 days) to cancel upon receipt.  Compl. Ex. 1, §§ 14, 19, 32.

[3] *See Martinez v. Ford Motor Co.*, 2022 WL 14118926, at *3 (S.D. Cal. Oct. 24, 2022) (dismissing claim where "Plaintiff does not plead how Defendant Ethos allegedly violated this service contract. . . . Plaintiff has not alleged any facts—such as dates of service, failures of repayment, or functional parts withheld—to afford Defendant Ethos fair notice of its alleged violation").

that alleged scheme has to do with a breach of contract claim.  The same is true of Salas's allegation that the Service Contract warranty was "inferior to what Plaintiff and Class members would have been able to obtain under Whirlpool's manufacturer's warranty."  Compl. ¶ 99.  Salas's Complaint is replete with complaints about the contract he agreed to, but he does not allege that AIGWG actually breached the Service Contract.  Salas admits as much, alleging that "[n]othing in the Service Contract put Plaintiff or the Class on notice that the Service Plan would provide them with a level of service below what is offered under Whirlpool's manufacturer's warranty." Compl. ¶ 99 (emphasis added).  AIGWG cannot have breached a provision that Salas admits does not exist.

Moreover, the Service Contract was not even in effect in January 2023.  The Service Contract's Certificate of Coverage, which Salas attached as Exhibit 5 to the Complaint, shows that AIG's extended coverage didn't start until July 2023.  AIG could not have breached contractual obligations it did not even have then.

Rather than identify any provision that AIGWG allegedly breached, Salas *admits that AIGWG performed* (assuming that AIGWG had any obligations when Salas made his service call in January 2023, which it did not, and assuming that AIGWG had service obligations at any time, which it did not): "On the date of scheduled service, the service technician sent by the Whirlpool Service Plan Department *serviced the appliance within the parameters that Defendants established for the Service Plan*."  Compl. ¶ 81 (emphasis added).  Salas's failure to allege AIGWG's nonperformance of a contractual duty it actually owed is fatal to his breach of contract claim against AIGWG.[4]

---

[4] *Hansen v. Marin Gen. Hosp.*, 2019 WL 1509182, at *2 (N.D. Cal. Apr. 5, 2019) (dismissing breach of contract claim with prejudice because "Hansen still does not allege how Anthem breached specific provisions of a specific contract *he* had with Anthem.") (emphasis added).

### (2)   *Salas fails to Plead any Resulting Damages.*

Salas never explains how the alleged Payout Scheme (which has nothing to do with breach of contract) caused Salas any harm, namely because *Salas does not allege that AIGWG exercised a buyout* for Salas's range.  On the contrary, *Salas admits that his range was repaired*.  Compl. ¶¶ 81-82.  Salas has not pled (and cannot plead) facts supporting the necessary elements for breach of contract.

### C.   **Salas Fails to State a Claim for Violations of the Song-Beverly Act (Count Three).**

Salas alleges that Defendants violated California's Song-Beverly Act in three ways.  *First*, Salas alleges that Defendants did not provide the Service Contract terms until after Salas bought the warranty.  Cal. Civ. Code § 1794.41(a)(2).  *Second*, Salas alleges that the Service Contract's exclusions are not "clear and conspicuous."  *Id.* § 1794.4(c)(5)(A), (B); *id.* § 1791(u).   And *third*, Salas alleges that the Service Contract's coverage period impermissibly overlaps with the manufacturer warranty's coverage period.  *Id.* § 1794.41(a)(3).  Salas is wrong as a matter of law, and his Song-Beverly Act claim should be dismissed for at least four reasons.

### (1)   *Salas Agreed that he Read the Contract Terms that AIGWG provided him Before Purchase Per Judicially Noticeable Facts.*

Under California's Song-Beverly Act, "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation . . . under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief."  Cal. Civ. Code § 1794(a).  The Song-Beverly Act requires that every service contract "be available for inspection by the buyer prior to purchase and either the contract, or a brochure which specifically describes the terms, conditions, and exclusions of the contract, and the provisions of this section relating to contract delivery, cancellation, and refund, shall be delivered to the buyer at or before the time of purchase of the contract."  *Id.* § 1794.41(a)(2).  Where the service contract's terms "were made available, then the purchaser has no claim under Cal.

1   Civ. Code § 1794.41(a)(2)." *Sanbrook v. Office Depot, Inc.*, 2009 WL 840020, at *2

2   (N.D. Cal. Mar. 2009).

3       As explained to Salas's counsel at the Local Rule 7-3 conference, AIGWG

4   makes the Service Contract available to all purchasers (including Salas) before they

5   buy the contract.  As reflected on AIGWG's website, which this court can take judicial

6   notice of (*see* Request for Judicial Notice ("RJN"); Bond Declaration ¶¶ 2-13), Salas

7   had no less than *five* opportunities to review the Service Contract, not only on the

8   home page but also throughout the checkout process.[5]   Salas's own Complaint

9   includes a screenshot of that home page with the hyperlinked "<u>terms and conditions</u>"

10   that takes purchasers to the contracts.  Compl. ¶ 45.  Perhaps most importantly, even

11   if Salas missed the terms there (and in the several other opportunities he had

12   throughout the checkout process), he was required to *certify* before purchase that he

13   read the terms and conditions in the hyperlink in the middle of the purchase page[6]:

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23

---

24       [5] The consumer purchase pathway is described more fully in the AIGWG's
25   Request for Judicial Notice and in the supporting Bond Declaration, which attaches
     the relevant screenshots as Exhibits A-I.  Those documents confirm that consumers
26   have at least five chances to access an e-copy of the service contract on the service
     plan website (https://serviceplans.whirlpool.com/), which Salas references in his
27   Complaint (¶ 40 n.3).

28       [6] *See* Bond Decl. Ex. I (consumers must check a box certifying that "I have read
     and accept the Service Plan <u>terms & conditions</u>[] and agree to <u>electronic delivery</u> of
     my plan related documents" to make their plan purchase).

1
2
3
4
5
6
7
8
9
10
11
12



13   *Salas thus agreed* that the Service Contract's terms were available at the

14   website he identifies in his Complaint (https://serviceplans.whirlpool.com/ (Compl. ¶

15   40 n.3)) and that he read them at the time he purchased the contract. That kind of

16   clickwrap agreement is enforceable in California. *Sellers v. JustAnswer LLC*, 73 Cal.

17   App. 5th 444, 470 (2021) ("[C]lickwrap agreements, in which website users are

18   required to click on an 'I agree' box after being presented with a list of terms and

19   conditions of use' to 'confirm their assent to the agreement's terms,' are generally

20   considered enforceable."). Simply put, Salas certified that he reviewed the terms, so

21   he cannot now claim ignorance and use consumer laws to back out of the deal.

22   Because the terms "were made available . . . [Salas] has no claim under Cal. Civ. Code

23   § 1794.41(a)(2)."[7] *Sanbrook*, 2009 WL 840020, at *2.

24   / / /

25   / / /

26   / / /

27

28   _____
   [7] The Service Contract also contains a "free look" provision, which gave Salas no less than 30 days after delivery of the contract to cancel. Compl. Ex A ¶¶ 19, 32.

*(2)*     *The Service Contract Did Not Impermissibly Overlap with the Manufacturer's Warranty.*

The exhibits that Salas attached to his Complaint, including the Service Contract and AIGWG's certificate of coverage, bar Salas's Song-Beverly Act claim based on a contractual overlap. *Meisner v. JPMorgan Chase Bank, N.A.*, 2022 WL 837230, at *1 (E.D. Cal. Mar. 18, 2022) (dismissing complaint with prejudice where the plaintiff's allegations "contradict the documents attached to his complaint").

The Song-Beverly Act says that "[n]o service contract covering any . . . home appliance[] or home electronic product purchased for use in this state may be offered for sale or sold unless. . . [t]he contract is applicable only to items, costs, and time periods not covered by the express warranty." Cal. Civ. Code § 1794.41(a)(3). Salas alleges that the Service Contract impermissibly overlapped with the Whirlpool manufacturer warranty. Compl. ¶ 128. But that allegation is incurably defective because Salas has a timing problem. According to Salas's own allegations and the exhibits he attached to the Complaint, ***there was no impermissible coverage overlap***. Salas alleges that he bought his range on July 21, 2022, which came with Whirlpool's one-year manufacturer warranty. Compl. ¶¶ 4, 37, 67. He claims that the manufacturer warranty was in effect when his range allegedly malfunctioned and was serviced in January 2023. Compl. ¶¶ 71, 78-82.

But the certificate of coverage that Salas attached to the Complaint confirms that coverage under the Service Contract did not kick in until July 2023—*six months later*. Compl. Ex. 5 ("Effective Date: 7/1/2023"). And it also confirms that "Parts and Service currently covered under the manufacturer's warranty *will be provided by the manufacturer*." *Id.* (emphasis added). The Service Contract itself (which Salas also attached to the Complaint) also unequivocally confirms that coverage would not kick in until *after* the manufacturer warranty expired: "**EXCLUSIONS** – This contract does not cover . . . **G. Repairs and replacements covered by the manufacturer or supplier's warranty**, . . ." Compl. Ex. 1 § 18G (emphasis in

14

original).   Salas even admits as much.   *See, e.g.*, Compl. ¶ 37 (alleging that Whirlpool's website "explains the Service Plan as beginning *after the manufacturer's warranty ends*") (emphasis added).  There was no impermissible coverage overlap, so his Song-Beverly claim under this provision fails as a matter of law.[8]  *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1308 (S.D. Cal. 2003) ("Plaintiff must . . . specifically plead what specific requirements of . . . the Song Beverly Act were not complied with and what damages were suffered by such omissions.").

And, because the Service Contract was not in effect when Salas's range was allegedly serviced, there is no overlap that plausibly caused him any harm, which is an independent reason to reject this claim.

### (3)   The Service Exclusions Were "Clear and Conspicuous"

The Song-Beverly Act also requires, in relevant part, that "[t]he service contract . . . contain . . . clear and conspicuous statements of the following: (A) Any services, . . . repairs, or remedies that are excluded from the scope of the service contract. (B) Any other limits on the application of the language in subdivision (b) . . . ." Cal. Civ. Code § 1794.4(c)(5)(A-B).  Subdivision (b) says that "[e]xcept as otherwise expressly provided in the service contract, every service contract shall obligate the service contractor to provide to the buyer of the product all of the services and functional parts that may be necessary to maintain proper operation of the entire product under normal operation and service for the duration of the service contract and without additional charge." *Id.* § 1794.4(b).

Salas's allegation that the exclusions in the Service Contract are not sufficiently "clear and conspicuous" under Song-Beverly fails as a matter of law.  Compl. ¶ 122.

/ / /

/ / /

---

[8] As explained in Whirlpool's motion to dismiss, even if there was a potential de minimis overlap of days in July 2023, that overlap additionally would not violate the Song-Beverly Act because the Service Contract provides benefits not available under the Whirlpool manufacturer warranty. *See* Whirlpool Memorandum at Section III.B; Cal. Civ. Code § 1794.41(a)(3).

a) <u>Section 1794.4 does not provide a private right of action.</u>

As a threshold matter, "Cal. Civ. Code § 1794.4 . . . is simply a detailed description of what information is required to be included in a service contract. No remedy or right of action is provided in § 1794.4." *See Von Grabe*, 312 F. Supp. 2d at 1308.  Salas cannot sue under a provision that does not provide a private right of action.

b) <u>The Service Contract complies with Section 1794.4.</u>

Regardless, the Service Contract complies with Section 1794.4 because the relevant terms are sufficiently "clear and conspicuous." Terms are clear and conspicuous if they appear in "a larger type than the surrounding text, or in a contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Civ. Code § 1791(u). Salas appears to allege that the "Buyout option[]" provisions and the provisions that "limit the[] obligation to provide the repairs that keep the product operational during the term of the Service Plan" are not clear and conspicuous because they are not sufficiently "capitalized, underlined, bolded, or written in a different size font," nor are they "set off from the surrounding text in a way to make them stand out." Compl. ¶ 123.

Those allegations are not only implausible—they are *false*. Per the Service Contract attached as Exhibit 1 to the Complaint, each section that discusses the "buyout option" is bolded and capitalized, including the buyout provision itself:

- **3. LIMIT OF LIABILITY**. The coverage amount available to You for each claim under this Agreement is the Product-age value specified in the depreciation schedule Section 14 Exchange or Buyout.
- **6. OBLIGATION FULFILLED**. If pursuant to Section 14 the Product is Exchanged or a Buyout is provided, Our contractual obligations under this Agreement are fulfilled.
- **11. SERVICE EVENT**. After Your claim is authorized, We will, at Our option, (a) repair Your Product, using parts pursuant to Section 13 Repair Parts, or (b) Exchange or Buyout Your Product as provided in Section

14. The decision to repair, Exchange, or Buyout Your Product will be made solely by Us.

**IMPORTANT NOTE:** If three service repairs have been completed on the same part, and that part requires a fourth repair, as determined by Us, we will likely at our sole discretion – provide an Exchange, or Buyout for Your Product as provided under Section 14.

- **12. UNABLE TO REPAIR**. If We determine that We are unable to repair Your Product for any reason, such as the unavailability of functional part, service, or technical information, We will Exchange or Buyout Your Product as provided in Section 14. We may provide at Our discretion, an Exchange or Buyout, as provided in Section 14 when parts are on extended backorder or technical information is unavailable, for a minimum of forty-five (45) calendar days. . . .

- **14. EXCHANGE OR BUYOUT.**

Compl. § Ex. 1 (Service Contract).

The same is true of those provisions that "limit the[] obligation to provide the repairs that keep the product operational during the term of the Service Plan." Compl. ¶ 123; *id.* Ex. 1 ("**18. EXCLUSIONS**"). Salas does not allege (and cannot allege) what more is needed to make those provisions stand out.  Inasmuch as Salas alleges that those provisions are not clear and conspicuous because they are "piece-meal" (Compl. ¶ 124), Salas is wrong because they appear on the first two pages of the (short) Service Contract, and Song-Beverly's "clear and conspicuous" language does not prohibit piecemeal provisions. The Song-Beverly count fails as a matter of law.

### (4)   *Salas Does Not Allege that any (Non-Existent) Technical Violation of Song-Beverly Caused Him Harm.*

AIGWG did not breach any provision of the Song-Beverly Act, as explained below.  But even if it did, Salas was required to allege facts showing how that (unpled) breach caused him damages.  *See* Section IV.A.3 above.  Because he fails to do so, this claim should be dismissed. *Von Grabe*, 312 F. Supp. 2d at 1308 ("Plaintiff must . . . specifically plead what specific requirements of § 1794.4 or other provision of the Song Beverly Act were not complied with *and what damages were suffered by such omissions*.") (emphasis added).

**D.     Salas Fails to State a Claim for Violations of the CLRA or UCL (Counts Two and Four).**

Salas's CLRA and UCL claims are premised on largely the same facts, and they fail for similar reasons.  *First*, both claims sound in fraud, but Salas has not pled them with particularity.  The claims fail for that reason alone.  *Second*, Salas cannot use the UCL to change the parties' bargain.  *Third*, Salas fails to state a claim under the UCL's "unlawful" prong because his predicate statutory claims fail and because breach of contract cannot form the basis for a UCL claim.  *Fourth*, Salas fails to state a claim under the UCL's "unfair" prong because his allegations fail the applicable pleading standards and because he fails to plead the elements of the claim.  *Fifth*, Salas fails to state a CLRA claim because he does not plausibly allege that AIGWG did anything to deceive a reasonable consumer or that AIGWG owed Salas a duty to disclose.

### (1)     *Salas Does Not Plead His Claims with Particularity.*

"The UCL prohibits any 'unlawful, unfair, or fraudulent business act.'"  *Santa Barbara Smokehouse, Inc. v. AquaChile, Inc.*, 2020 WL 6743592, at *4 (C.D. Cal. July 7, 2020) (quoting Cal. Bus. & Prof. § 17200).  "An act can be alleged to violate any or all of the three prongs of the UCL — unlawful, unfair, or fraudulent."  *Chulick-Perez v. CarMax Auto Superstores Cal., LLC*, 2014 WL 2154479, at *5 (E.D. Cal. May 22, 2014).  "The CLRA makes illegal various 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.'"  *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *8 (C.D. Cal. Oct. 3, 2014) (citing CAL. CIV. CODE § 1770(a)). "Conduct that is likely to mislead a reasonable consumer violates the CLRA."  *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *8 (citation omitted).  Where UCL and CLRA claims "sound in fraud," the claims must be pled with particularity under Rule 9(b).  *Chulick-Perez*, 2014 WL 2154479, at *5-6.

1      As a threshold matter, Salas's UCL and CLRA claims both sound in fraud, so

2   Salas was required to plead them with particularity under Rule 9(b).  *Kearns v. Ford*

3   *Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Salas alleges, for example, that

4   Defendants perpetuated the Payout Scheme (Compl. ¶¶ 106(a) - (c), 107(d), 108(a),

5   140(f), 140(i)), falsely represented that their long-term service plans provide better

6   value than their short-term service plans (Compl. ¶¶ 106(d), 107(g), 137, 140(b)),

7   falsely represented that the service plans offer "100% Factory Certified Parts and

8   Technicians" even though they have the right to swap a covered appliance with a

9   refurbished appliance (Compl. ¶ 107(e)), falsely represented that the service plans are

10  a mere extension of the Whirlpool manufacturer warranty (Compl. ¶¶ 107(a), 136,

11  140(a), 140(g)), made false representations that caused consumers to call the wrong

12  repair number (Compl. ¶ 140(h)), and falsely represented, "If We can't Fix it – We

13  Replace It" (Compl. ¶¶ 107(b), (c)).

14     Even ignoring that the lion's share of those allegations has nothing to do with

15  what actually happened to Salas (*see* Section IV.A. above), Salas does not even

16  attempt to plead the "who, what, when, where, and how" of that alleged fraud as

17  required by Rule 9(b) (*Cafasso ex. rel. United States v. Gen. Dynamics C4 Sys.*, 637

18  F.3d 1047, 1055 (9th Cir. 2011))—undoubtedly because there was no fraud.  This

19  Court should dismiss Salas's CLRA and UCL claims (including his "fraudulent"

20  prong UCL claim) with prejudice.

21         **(2)    *Salas Cannot Use the UCL to Change the Parties' Bargain***

22     Salas cannot use the UCL as a sword to change the terms of the Service

23  Contract.  Inasmuch as Salas is unhappy with his bargain—for example, by alleging

24  that he is unhappy with the buyout clause he agreed to (even though that clause has

25  nothing to do with his claimed injury, as explained in Section IV.A. above)—he

26  cannot use the UCL to alter the terms of that bargain.  Courts in the Ninth Circuit

27  routinely dismiss UCL claims that would require them to rewrite contracts.  *See, e.g.*,

28  *Quattrocchi v. Allstate Indem. Co.*, 2018 WL 347779, at *3 (E.D. Cal. Jan. 8, 2018)

("[C]ourts have found that no UCL claims lie where the defendant has followed the express language of unambiguous provisions from insurance policies and other contracts."), *aff'd*, 775 F. App'x 330 (9th Cir. 2019); *Rosenbluth Int'l v. Superior Court*, 101 Cal. App. 4th 1073, 1077 (2002) (explaining that the UCL is not a catch-all for breach of contract).

As explained above, consumers like Salas must certify that they read the contract terms before purchase (Bond Decl., Ex. I), and the contract contains a "free look" period that allowed him to cancel after receipt.  There was no deception, and the fact that Salas fails to identify a single contractual provision that AIGWG breached (*see* Section IV.B.1 above) proves it.  AIGWG didn't do anything wrong—Salas simply wants to change the deal.  That is not allowed under California law.

### (3)    *Salas Fails to State a Claim Under the UCL's "Unlawful" Prong*

To state a claim under the "unlawful" prong, Salas was required to allege that AIGWG "engaged in a business practice forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1044 (9th Cir. 2010).  Salas fails to state an "unlawful" prong claim because he does not plausibly allege that AIGWG violated any other law.  *Martinez*, 2022 WL 14118926, at *3-4.  Although he claims that AIGWG's alleged violations of the CLRA and Song-Beverly Act form the basis of his "unlawful" prong UCL claim (Compl. ¶ 134), the CLRA and Song-Beverly claims fail as matter of law as explained in Section IV.C. above and Section IV.D.5 below. *See id.*, at *4 ("Plaintiff fails to plead the unlawful prong of the UCL because . . . he fails to adequately plead a violation of the Song-Beverly Act. A UCL claim stands or falls depending on the fate of antecedent substantive causes of action.") (citation omitted).  Therefore, they cannot provide a basis for Salas's "unlawful" prong UCL claim.

The UCL claim also fails inasmuch as it is based on Salas's alleged breach of contract.  *See, e.g.*, Compl. ¶ 140(d)-(e).  As explained in Section IV.B. above, there

was no breach, but even if there was, it is settled that a breach of contract claim cannot form the predicate of a UCL claim. *Shroyer*, 622 F.3d at 1044.

### (4)   *Salas Fails to State a Claim for Violation of UCL's "Unfair Prong"*

While the UCL does not define "unfair," California courts in consumer class actions generally require plaintiffs like Salas to allege that the practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018). Any injury to the consumer must be "substantial," "not outweighed by any countervailing benefit to consumers," and "not an injury the consumers themselves could reasonably have avoided." *Martinez*, 2022 WL 14118926, at *4.

Salas's "unfair" prong claim fails because he did not allege facts meeting that test. Salas does not identify any policy that AIGWG allegedly violated, nor does he plead facts demonstrating that AIGWG's (unpled) conduct was "immoral, unethical, oppressive, unscrupulous or substantially injurious" to Salas. As discussed in detail above, most of the alleged conduct by the Defendants has nothing to do with Salas. At most, Salas makes vague (and conclusory) allegations that AIGWG deceived Salas into calling the wrong phone number so that he would receive repairs under the "inferior" service plans rather than the superior manufacturer warranty. Compl. ¶ 140(h). That conclusory allegation makes no sense. Why would AIGWG encourage customers to seek coverage under a plan for which it is the obligor (Compl. Ex. 1 at p.1) when customers are covered by the manufacturer warranty that is covered exclusively by Whirlpool? Salas's allegation is not just implausible; it defies logic. *C.f. Petzshke v. Century Aluminum Co. (In re Century Aluminum Co. Sec. Litig.)*, 729 F.3d 1104, 1108 (9th Cir. 2013) (allegation not credited as true where it is "merely possible rather than plausible" and there is an "obvious alternative explanation") (emphasis omitted).

1    Salas also fails to allege facts (as opposed to conclusions) showing why

2   AIGWG is at fault for Salas's allegedly calling the wrong service number. *Martinez*,

3   2022 WL 14118926, at *4 (dismissing "unfair" prong UCL claim where the plaintiff

4   failed to allege that his injury was not one that he "could reasonably have avoided").

5   Nor does Salas plead any facts explaining why his "concerns about the product

6   remained unresolved after [Whirlpool's] service visit" (Compl. ¶ 82) that would

7   justify his hiring an independent repair person and incurring out-of-pocket expenses.

8   Salas's barebones, implausible allegations are not sufficient to state a claim under the

9   UCL's "unfair" prong.

10           *(5)    Salas Does Not Allege Facts that AIGWG Violated the CLRA.*

11           Without explaining how, Salas alleges that AIGWG violated five CLRA

12   provisions by its "omissions, misrepresentations, and practices" (Compl. ¶ 111).

13   Among other things, those provisions bar misrepresentations about a service's

14   "characteristics, . . . uses, [or] benefits" (Cal. Civ. Code § 1770(a)(5)); about a

15   service's "standard, quality, or grade" (*id.* § 1770(a)(7)); about a service's "rights,

16   remedies, or obligations" (*id.* § 1770(a)(14)); (4) that the "subject of a transaction has

17   been supplied in accordance with a previous representation" (*id.* § 1770(a)(16)); and

18   that the "consumer will receive a rebate, discount, or other economic benefit" (*id.* §

19   1770(a)(17)).

20           Salas merely lists those provisions without explaining what alleged conduct

21   purportedly violates which provision or how.  The claim fails for that reason alone,

22   because Salas does not give AIGWG of fair notice of why its alleged conduct violates

23   the CLRA.  *Cf. Cork v. CC-Palo Alto, Inc.*, 534 F. Supp. 3d 1156, 1183 (N.D. Cal.

24   2021) (requiring the plaintiff to plead facts sufficient to give Defendants "fair notice

25   of the basis of the CLRA claim").

26           Moreover, inasmuch as this claim is based on AIGWG's alleged "omissions"

27   (Compl. ¶ 111), the claim fails because Salas does not (and cannot) allege that

28   AIGWG had a duty to disclose or that Salas relied on any omission. *Steele v. GM LLC*,

1  2018 WL 6039838, at *2-3 (C.D. Cal. Aug. 8. 2018).  And, Salas certified before

2  purchase that he reviewed the Service Contract's terms, (Bond Decl., Ex. I), which

3  address those topics. As a matter of law and common sense, he cannot claim that he

4  was misled about things he agreed to before purchase.  Salas also alleges that

5  Defendants made "illusory" promises because any contractual rights "could be freely

6  extinguished by Defendants' decision to exercise the Buyout options."  Compl. ¶ 109.

7  But as explained throughout this Motion, Salas has no standing to challenge the

8  Buyout provision, which in any event is an express term in the Service Contract that

9  Salas certifies he read and could have canceled at least 30 days and up to 60 days after

10  receipt.  Compl. Ex. 1, §§ 14, 19, 32.

Moreover, Salas's CLRA claim, which is based on the same alleged "omissions,

12  misrepresentations, and practices" (Compl. ¶ 111) that comprise his UCL claim, fails

13  for all the reasons explained in the UCL section above.[9]  *See* Section IV.C.1-4.  Salas

14  has not alleged that AIGWG did anything "likely to mislead a reasonable

15  consumer."  *Herremans*, 2014 WL 5017843, at *8 (citation omitted).

16  **E.     The Express Terms of the Service Contract Bar Salas from**

17  **Recovering Out-of-Pocket Expenses or Consequential Damages.**

18  The Service Contract expressly bars Salas from recovering damages for "out-

19  of-pocket" expenses based on an independent "repair person['s] . . . visit[ing] his

20  home and fix[ing] his appliance" (Compl. ¶¶ 14, 82, 83, 129) or lost income from his

21  scheduling a service visit during work hours (Compl. ¶ 80), two forms of relief that

22  he seeks in his prayer.  *See Walker v. McCloud Cmty. Servs. Dist.*, 2016 WL 951635,

23  at *2 (dismissing damages under Rule 12(b)(6)).[10]

24  ───────────────

25  [9] In his CLRA count, Salas also requests an order enjoining "Defendants' methods, acts, and practices in conducting transactions in California in violation of the . . .

26  Magnuson-Moss Warranty Act[] and California False Advertising Law."  Compl. ¶ 115.  Salas does not allege that Defendants violated either act and in any event does not plead predicate facts to establish a violation of either.

27

28  [10] Although Rule 12(b)(6) is the proper vehicle to challenge a damages prayer where, as here, the plaintiff's allegations are not sufficient to warrant an award of damages

Various provisions of the Service Contract significantly limit the scope of recoverable damages in this case. Section 8 states that Salas "will not be reimbursed for work not authorized by Whirlpool," including work performed by an "independent repair person" that is not "authorized or requested" by Defendants.  Compl., Ex. 1, § 8.  Section 11 contemplates that Defendants be given three chances to repair Salas's range.  Compl., Ex. 1, § 11 ("If three service repairs have been completed on the same part, and that part requires a fourth repair, as determined by Us, we will likely at our sole discretion - provide an Exchange, or Buyout for Your Product. . . .").  The Service Contract also bars recovery for any "INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO . . . LOST TIME." Compl., Ex. 1, § 30; *see also id.* at § 18H ("This Contract Does Not Cover . . . Consequential damages, including damages: (2) caused by . . . or loss of business, including loss of profits. . . .").

Given these various limitations, Salas does not allege facts showing that he is entitled to recover his out-of-pocket expenses for hiring an independent repairman to fix his range or to recover damages for lost wages.  *First*, with respect to out-of-pocket expenses, Salas does not allege that Defendants "authorized or requested" Salas to hire an independent repair person or that he provided Defendants with the invoice and a description of the charges.  Nor does Salas allege that he gave Defendants more than one chance to repair his range.  On the contrary, Salas alleges that Whirlpool "serviced the appliance *within the parameters that Defendants established for the Service Plan*" (Compl. ¶ 81 (emphasis added)), indicating that Salas did not tell Defendants that he believed Whirlpool's repair was insufficient, never mind that he planned to hire an unauthorized repairman to make further repairs.  Absent those kinds of factual allegations, the Service Contract bars Salas from recovering the costs of an independent repairman.

as a matter of law (*see Walker*, 2016 WL 951635, at *2), AIGWG alternatively seeks to strike that prayer under Rule 12(f).

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT

*Second*, with respect to damages for lost wages, Salas's allegation that "he took time off from work to meet the repair technician and lost the opportunity to earn income during this period" is insufficient to recover those lost wages and income. Compl. ¶ 80.  The Service Contract unequivocally bars recovery of any such damages. Compl., Ex. 1, § 30 (no incidental or consequential damages, including damages for lost time); *id.* at § 18H (no consequential damages, including damages for loss of business or loss of profits.").  No amendment can cure these issues—the Service Contract that Salas put at issue is clear and unambiguous.  This Court should dismiss Salas's prayer for out-of-pocket expenses and lost wages with prejudice.

### F.  Leave to Amend is Futile.

Leave to amend a complaint should not be granted where, as here, amendment would be futile. And amendment is futile if the amended complaint would be immediately subject to dismissal.  *Raifman v. Wachovia Sec., LLC*, 2012 WL 1611030, at *2 (N.D. Cal. May 7, 2012).  Salas can never state a cognizable legal theory against AIGWG because, among other reasons, (1) he lacks standing to sue because he has not alleged (and cannot allege) that he has suffered *any* legally cognizable harm as a result of AIGWG's conduct; (2) he cannot state a breach of contract claim because AIGWG didn't breach the contract; (3) he cannot state a Song-Beverly claim because the Service Contract and plan website prove that there was no violation; and (4) he cannot state a CLRA or UCL claim for many incurable reasons, including that most of the alleged conduct has nothing to do with Salas.  No additional pleading can change those realities.  For at least those reasons, this Court should deny leave to amend.

## V.  **CONCLUSION**

AIGWG respectfully requests that this Court dismiss the Complaint with prejudice.

/ / /

/ / /

Dated: September 27, 2023

RACHEL LOWE
ETHAN BOND
**ALSTON & BIRD LLP**

By:   */s/ Rachel E. K. Lowe*
Rachel Lowe

Attorneys for Defendant
AIG WARRANTYGUARD, INC.

26