1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| ORLANDO SALAS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WHIRLPOOL CORPORATION and AIG WARRANTYGUARD, INC.,<br><br>Defendants. | Case No. 5:23-CV-01549-AB-KK<br><br>**ORDER GRANTING MOTIONS TO DISMISS SECOND AMENDED COMPLAINT [Dkt. Nos. 83, 84]** |

17
18
19
20
21
22

Before the Court are Motions to Dismiss Second Amended Complaint filed by Defendants Whirlpool Corporation ("Whirlpool") and AIG Warrantyguard, Inc. ("AIGWG") (Dkt. Nos. 83, 84). Plaintiff Orlando Salas filed a consolidated opposition ("Opp'n" Dkt. No. 88), and each Defendant filed a reply (Dkt. Nos. 91, 92). The Court heard oral argument on April 11, 2025. The Motions are **GRANTED**.

23
24

**I.    PROCEDURAL BACKGROUND AND PLAINTIFFS' SECOND AMENDED COMPLAINT**

25
26
27
28

The Court previously set forth the background of this putative class action in its Order Granting Motions to Dismiss Plaintiff's Orlando Salas's original Complaint. *See* Order (Dkt. No. 51); *Orlando Salas v. Whirlpool Corporation, et al.*, 2024 WL 694067 (C.D. Cal. 2024). Briefly, Plaintiff Orlando Salas purchased an extended

1

service plan ("Service Plan") for his Whirlpool range. Salas alleged his dissatisfaction with a particular service visit in January 2023, and alleged that the email he received marketing the Service Plan, and the website marketing Whirlpool Service Plans that the email linked to, included misrepresentations that mislead him into purchasing the Service Plan. Based on these allegations, Salas alleged claims for: (1) breach of contract; (2) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (3) violation of Song-Beverly Consumer Warranty Act ("Song-Beverly Act"), Cal. Civ. Code § 1790 *et seq.*; and (4) violation of Cal. Bus. & Profs. Code § 17200, *et seq.* The Court dismissed the Complaint, finding that Salas failed to allege any breach of contract, that he lacked standing to pursue injunctive relief for his consumer protection claims, and that he failed to state any of his consumer protection claims for various reasons.

Thereafter, Plaintiff filed a First Amended Complaint. Defendants filed motions to dismiss the First Amended Complaint that were fully briefed when Plaintiff filed a motion to amend the complaint. Defendants did not oppose the motion for leave to amend, so the Court granted it, and Plaintiffs filed the now-operative Second Amended Complaint ("SAC," Dkt. No. 81).[1]

The SAC narrows the case in some ways and expands it in others: Salas dropped his allegations concerning the service visit and his claim for breach of contract, but the SAC apparently adds named plaintiffs Paul Papanek and Brian Steacy[2] as class representatives. Whereas Salas's claims are based on alleged misrepresentations in the marketing email he received and the website he visited, Papanek and Stacey base their claims on statements in mailings they received. In

---

[1] Plaintiffs titled their Second Amended Complaint only "Amended Class Action Complaint…" For clarity, amended pleadings should be numbered, which the Court does in this Order.

[2] The SAC's caption/title lists Orlando Salas as the only plaintiff. The apparent new plaintiffs Papanek and Steacy should also have been identified in the caption/title. *See* Fed. R. Civ. P. 10(a), C.D. Cal. Local Rule 11-3.8.

addition, Steacy alleges a claim for breach of contract based on the allegation unique to him that Defendants bought out his appliance instead of replacing it.

As before, the SAC alleges that Whirlpool and AIGWG "market and sell extended repair plans ('Service Plans') to consumers who purchase household appliances ('Whirlpool Appliances') that Whirlpool markets under various brand names." SAC ¶ 1. Whirlpool is the "administrator" of the Whirlpool Service Plans, and AIGWG is the obligor. SAC ¶ 2. These Defendants market the Service Plans to consumers through websites and by contacting consumers who have registered their appliances with Whirlpool. SAC ¶ 3.

The SAC alleges that various terms of the marketing materials are deceptive in many ways.[3] But generally, Plaintiffs allege that the Service Plan provides inferior coverage than what Defendants' marketing materials advertised, and/or have terms that are inconsistent with the marketing. Plaintiff Salas's Service Contract is attached as Exhibit 7 to the SAC. Plaintiffs treat Salas's Service Contract as representative of each Plaintiff's Service Contract. *See* SAC p. 47, fn.8. Indeed, none of the briefing suggests the Plaintiffs' contracts differ in any material way so the Court will treat Salas's Service Contract at SAC Ex. 7 as representative, and all references to the Service Contract are to this version.

The Court briefly describes the Service Contract. It is about five and a half pages long. The text on each page is presented in two columns. Each page has a header that reads "**Service Contract Terms and Conditions**." The first approximately two-and-three-quarter pages have paragraphs numbered 1 to 32, with

---

[3] The Court characterized the original 141-paragraph, 49-page, Complaint as prolix and of a kitchen-sink nature. The SAC is even more so: it is 81 pages long, consisting of 203 numbered paragraphs of overlapping and repetitive factual allegations and claims. As before, many allegations read like counsel's after-the-fact critique of Defendants' marketing materials and the Service Contract, rather than a reflection of Plaintiffs' own experiences. Given the length of the SAC, the Court relied on summaries from the parties' memoranda for this background.

bold and all caps headings, presenting the terms of the Service Contract. The last of
these paragraphs, "32. STATE VARIATIONS," covers the remaining almost 3 pages
of the Service Contract and presents provisions that apply to particular identified
states. Thus, the first two-and-three-quarter pages contain the terms and conditions
applicable to all purchasers, and all of the terms that Plaintiffs complain about. The
remaining almost 3 pages are not in issue.

The SAC alleges as follows for each Plaintiff.

***Orlando Salas:***

Orlando Salas purchased a Whirlpool-manufactured range around July 21,
2022. SAC ¶ 47. Soon after registering his new Whirlpool range with Whirlpool,
Salas received a marketing email thanking him for registering his appliance and
suggesting that he protect it with a Whirlpool Service Plan. *Id.* ¶ 47. The email
included a hyperlink titled "Learn more about a Whirlpool Service Plan." *Id.* ¶ 49.
Salas clicked on this link and was taken to Whirlpool's website where he "viewed"
various representations about the Whirlpool Service Plan. *Id.* ¶¶ 49-60. The SAC
alleges some of the content of the website, includes a partial reproduction of one page,
and alleges that Salas "viewed" or "reviewed" some, but not all, of the content. *Id.*

The following are examples of the website's allegedly misleading terms and
undisclosed limitations: that the Service Plan's term might end before the full duration
if Defendants opted to buy out Salas's appliance rather than repair or replace it (SAC
¶¶ 52, 56, 61); that the statement "additional years of coverage available" meant that
the Service Plan extended the standard Whirlpool manufacturer's warranty (SAC ¶¶
54, 56, 57, 58, 60); the website did not put Salas on notice that the Defendants could
choose to not repair a fixable appliance but could buy it out instead (SAC ¶ 61).

On September 13, 2022, in reliance on whatever representations Salas viewed,
he purchased a Whirlpool Service Plan for $65.95. *Id.* ¶ 62.

Salas "did not view the Service Contract before finalizing his purchase – he did
not see a link readily making this document available." *Id.* Nor was he provided with a

copy of his Service Contract before or immediately after purchasing his plan. *Id.* ¶ 63. The same day Salas completed his purchase of the Service Plan, Defendants sent him a confirmation email but did not attach his Service Contract to this email. *Id.* ¶ 64. The email said that plan documents would be emailed to Salas within 3-5 business days or mailed to him in 15 business days. *Id.*

Three days later, on September 16, 2022, Salas received an email from AIGWG transmitting the Service Contract. *See* SAC ¶ 65, Ex. 7 ("Service Contract"). Salas briefly reviewed the Service Contract but "did not spend much time on it" because he thought he already understood it from the representations on the website and because there was no purpose to scrutinize the terms of a service he already purchased. *Id.*

Salas alleges that if Defendants had provided him with his Service Contract at the time of purchase, he "might have been more likely to scrutinize the Service Contract as the details of what he had just purchased were still the focus of his attention. … [he] might have been able to identity [sic] undisclosed Service Plan limitations such as those mentioned in the provisions pursuant to which Defendants exercise Buyouts." *Id.* ¶ 63.

Salas alleges that Defendants' "failure to provide [him] with a copy of his Service Contract at the time of purchase and to clearly and conspicuously state the plan's limitations in the Service Contract were factors preventing Salas from discovering the plan misrepresentations within the 60-day 'Free Look Period' during which he could have cancelled his Service Plan and received a full refund." *Id.* ¶ 66. Salas later learned that the Service Plan was "materially different – both in terms of the contractual provisions that govern them and in terms of how they are administered by Defendants – from the representations he viewed when formulating the decision to purchase his Service Plan." *Id.* ¶ 67. These differences, recited in SAC ¶¶ 114-116, reduce the value of his plan, and he would not have purchased the Service Plan had he known the website's representations were inaccurate. *Id.* ¶ 67.

1    ***Paul Papanek:***

2         Paul Papanek purchased a KitchenAid dishwasher around March 2022. *Id*. ¶ 68.

3    After registering it, he received a marketing letter from AIGWG. SAC ¶ 69. The SAC

4    includes an apparent partial reproduction of the letter, which reads, in part:

5         **KitchenAid Service Plan Benefits***

6         **No Service Fee**: No out-of-pocket expenses on covered repairs and

7         replacements.

8         **Customer Satisfaction**: U.S. based customer care center.

9         **Valuable Protection**: 100% parts and labor for covered repairs, where

10        applicable.

11        **Service by KitchenAid**: Only authorized technicians.

12   *Id.* ¶ 69.

13        The asterisk at the end of the phrase "**KitchenAid Service Plan Benefits***"

14   corresponds to text just above the detachable payment coupon on at bottom of the

15   same page that states, in relevant part, "*KitchenAid Service Plans are offered, sold

16   and issued with AIG Warrantyguard. Inc… Limitations and exclusions apply. See the

17   complete terms and conditions at serviceplans.kithcenaid.com/details." *See* Holt Decl.

18   Ex. 2 (Dkt. No. 83-3).[4]

19        Papanek alleges he "understood the marketing letter as an offer to extend his

20

21   _____

22   [4] The Court takes judicial notice of the entire letter at Holt Decl. Exhibit 2 and deems it incorporated by reference into the SAC. Indeed, Exhibit 2 appears to match the

23   partial letter Plaintiffs present at SAC ¶69. Plaintiffs do not challenge consideration of Exhibit 2. (Plaintiffs object to the Court considering the earlier letter presented in Holt

24   Decl. Exhibit 1, but that letter does not seem relevant and the Court has not considered it. In any event, both versions of the letter include the same text identified herein, so

25   the Court need not determine which of the letters Papanek responded to.) Plaintiffs also argue that the Papanek letter should not serve as a proxy for the Steacy letter,

26   which is not in the record. But Plaintiffs themselves allege that the Steacy letter was "similar to" the Papanek letter without elaborating on any differences. *See* SAC ¶ 83.

27   Thus, the Court will consider the Papanek letter to be representative of the Steacy

28   letter.

KitchenAid manufacturer's warranty with which he is familiar as a consumer." SAC ¶
70. He alleges that the representations "no out-of-pocket expenses on covered repairs
and replacements," "100% parts and labor for covered repairs, where applicable" and
"Service by KitchenAid: Only authorized technicians" all "seemed consistent with his
understanding of how the manufacturer's warranty works." *Id*. In reliance on the
representations identified above, Papanek bought a three-year service plan. *Id.* ¶ 73.
Papanek alleges that he purchased a service plan by returning the payment coupon
portion of the mailer along with a $125.00 check. *Id*. ¶ 71.

Papanek alleges that the payment coupon made no reference to the buyout
benefit. *Id.* Papanek also alleges that the letter did not state that the coverage term
"would stop being made available to Papanek before the end of the plan term he
selected in the event Defendants chose to Buyout his appliance before his plan
expired." *Id.* ¶ 71.

Papanek alleges that he experienced a problem with his dishwasher in
December 2023 and "filed a claim under his Service Plan," but was informed the issue
was not covered under his Service Plan." *Id.* ¶ 74. Papanek does not allege that the
denial of his service claim was improper and does not allege breach of contract.

Papanek does not allege that he visited the websites Salas visited or that he
relied on any representations other than those contained in the letter. Papanek does not
allege whether he read the Service Contract at any point before or after purchase, but
alleges that "[t]hrough inquiries that Papanek made to Defendants when seeking to
have his dishwasher repaired, Papanek became informed of the terms and conditions
of his Service Plan and discovered they differed materially from the representations
that were made to him in the marketing letter – for example, because Papanek's
Service Plan does not provide a level of protection comparable to the Whirlpool
Warranty." *Id.* ¶ 77. He also alleges that he learned the service contract contained
terms "inconsistent with several representations Papanek relied on when deciding to
purchase his Service Plan." *Id.* ¶ 78. In particular, he alleges that the Service Plan does

1   not provide 100% coverage for parts and labor because the Defendants can buy out his

2   appliance instead of repair it, and because the plan limits their liability to 75% of the

3   purchase price of the appliance. He also alleges that the marketing was misleading

4   because the coverage concludes before the term of the plan if the Defendants buy out

5   his appliance. *Id.* ¶ 78. Papanek alleges that he would not have purchased, or would

6   have paid less for, his Service Contract had he known the its terms. *Id.* ¶ 79.

7       ***Brian Steacy:***

8       Brian Steacy purchased a Whirlpool dishwasher around 2018. *Id.* ¶ 80. It

9   malfunctioned after his manufacturer's warranty expired but Whirlpool nevertheless

10  repaired the appliance. *Id.* ¶¶ 81-82. Defendants later sent him a marketing letter that

11  made representations "similar" to those in the letter Mr. Papanek received. *Id.* ¶¶ 83-

12  86. Like Papanek, Steacy does not allege that he visited any websites or relied on any

13  representations other than those contained in the marketing letter. Steacy understood

14  the letter as an offer to extend the level of service he had recently received from

15  Whirlpool beyond what his manufacturer's warranty provides. *Id.* ¶15. Steacy alleges

16  he understood the letter as an "offer to extend his Whirlpool Warranty." *Id.* ¶ 15. In

17  response to the offer, Steacy purchased a Service Plan. *Id.* ¶ 87.

18      Steacy's dishwasher malfunctioned again around April 2021. *Id.* ¶ 88. He

19  contacted Defendants with the expectation that Whirlpool would swiftly repair his

20  dishwasher as before but had a different experience. *Id.* ¶¶ 88-90. Defendants

21  dispatched a third-party repair service that told him it did not have the parts necessary

22  to repair his appliance. *Id.* After Steacy waited for four months for these repairs,

23  Defendants informed him that they would not repair or replace his appliance but

24  would instead buy it out from him per the terms of the Service Contract, which

25  provided for a cash settlement amount that was less than the original purchase price of

26  the dishwasher. *Id.* ¶¶ 90-92. To receive the payment, Defendants required Steacy to

27  sign a Proof of Destruction Affirmation ("PoDA"), which required him to

28  scrap/destroy his appliance, render it unusable, and dispose of it in accordance with

federal, state, and local regulations even though none of these obligations are mentioned in Defendants' Service Contracts. *Id*. ¶¶ 93-97.

Steacy objected to Defendants' proposed buyout resolution because it would not have made him whole. *Id*. ¶ 96. Whirlpool informed him that a buyout was his only option and he had 45 days to sign and return the PoDA before his Service Plan would be cancelled and he would receive no benefits. *Id*. ¶ 98. Left with no other option, Steacy signed the PoDA and submitted it to Whirlpool around September 15, 2021. *Id*. Soon after, Defendants stopped providing the repair or replacement coverage Steacy's Service Plan came with even though he had time remaining on it. *Id*. ¶ 99.

Based on the foregoing, the Plaintiffs allege the following causes of action on behalf of themselves and a class of California consumers who purchased a Service Plan: (1) violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* (SAC ¶¶ 131-145); (2) violation of the False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, *et seq.* (SAC ¶¶ 146-151); (3) violation of the Song-Beverly Warranty Act ("Song-Beverly Act"), Cal. Civ. Code § 1790, *et seq.* (on behalf of only Salas and the Class) (SAC ¶¶ 152-181); (4) violation of the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.* (SAC ¶¶ 182-190); and (5) on behalf of Steacy and the "Breach Subclass," a claim for breach of contract (SAC ¶¶ 191-203).

Both Whirlpool and AIGWG move to dismiss the SAC in its entirety, arguing that Plaintiffs fail to state any claims. Plaintiffs oppose.[5]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the

---

[5] The Court **DENIES** Plaintiffs' request that the Court take judicial notice of a 2013 Federal Trade Commission publication because it is not relevant to or helpful for the Court's determination of whether Plaintiffs have adequately pled their claims.

1  absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v.*
2  *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

3      When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the
4  factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94
5  (2007). But a court is "not bound to accept as true a legal conclusion couched as a
6  factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation
7  marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient
8  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"
9  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has
10  facial plausibility when the plaintiff pleads factual content that allows the court to
11  draw the reasonable inference that the defendant is liable for the misconduct alleged."
12  *Iqbal*, 556 U.S. at 678. Deciding whether a complaint satisfies the plausibility
13  standard is a "context-specific task that requires the reviewing court to draw on its
14  judicial experience and common sense." *Id.* at 679.

15      A court generally may not consider materials other than facts alleged in the
16  complaint and documents that are made a part of the complaint. *Anderson v.*
17  *Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials
18  if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged
19  the existence of the materials in the complaint or the complaint "necessarily relies" on
20  the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation
21  omitted). The court may also take judicial notice of matters of public record outside of
22  the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little*
23  *Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689-90.

24      In federal court, "[in] alleging fraud or mistake, a party must state with
25  particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).
26  "Rule 9(b) requires a plaintiff averring fraud to plead the 'who, what, when, where,
27  and how' of the alleged misconduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,
28  1106 (9th Cir. 2003).

# III.   DISCUSSION

The Defendants raise overlapping grounds for dismissal and join in each other's motions. The Court will therefore address both Motions together.

## A. Statutory Standing for UCL, CLRA, FAL, and Song-Berverly Act Claims

AIGWG argues that none of the Plaintiffs has statutory standing to pursue their claims under the UCL, CLRA, FAL, and Song-Beverly Act because the Plaintiffs have not pled that the Defendants caused them damage by their alleged non-compliance with these statutes.

Under the UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*, standing extends to "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Thus, to establish standing for a UCL claim, a plaintiff must: "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322 (2011). This means that a plaintiff "'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate *actual reliance* on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions.'" *Id.* at 326–27 (emphasis added) (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 306 (2009)). Under the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*, standing extends to "any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter." Cal. Bus. & Prof. Code § 17535. And under the CLRA, Cal. Civ. Code § 1750, *et seq.*, "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person." Cal. Civ. Code § 1780 (emphasis added). The parties agree that these standards for standing are essentially the same. *See, e.g., Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013)

11

("any plaintiff who has standing under the UCL's and FAL's 'lost money or property' requirement will, *a fortiori*, have suffered 'any damage' for purposes of establishing CLRA standing.") Similarly, under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq.*, only a buyer of consumer goods "who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Cal. Civ. Code § 1794(a).

In its first Order, the Court concluded that Salas failed to allege facts sufficient to establish statutory standing because the original Complaint failed to allege that Salas viewed or relied on any of the Defendants' alleged misrepresentations, so it failed to allege reliance and causation—that Defendants' conduct harmed him. The SAC has largely remedied this shortcoming by identifying some misrepresentations that each Plaintiff viewed and alleging that, and how, they relied on them.

AIGWG's motion focuses on the buyout provision, arguing that none of the Plaintiffs have alleged economic injury resulting from this provision: neither Salas nor Papanek received a buyout offer, so this provision was never applied to them, and Steacy in fact received the benefit of the buyout provision. But AIGWG's focus on whether and how the buyout provision was applied to each Plaintiff is too narrow. Plaintiffs have alleged facts sufficient to establish economic harm caused by Defendants' alleged conduct. Paraphrasing, they allege that based on specific representations in the marketing, they purchased the Service Plans at the offered price, expecting to receive benefits they claim were advertised in the Defendants' marketing, but the Service Plans in fact provide inferior service or differed from what was advertised. The Plaintiffs further allege that they would not have bought, or paid as much for, the Service Plans but for the Defendants' alleged misrepresentations. This is a viable theory of economic harm and causation under these statutes, and Plaintiffs allege facts supporting this theory sufficient to establish standing. *See Kwikset*, 51 Cal.4th at 330 ("A consumer who relies on a product label and challenges a

misrepresentation contained therein can satisfy the standing requirement of section
17204 by alleging, as plaintiffs have here, that he or she would not have bought the
product but for the misrepresentation. That assertion is sufficient to allege causation—
the purchase would not have been made but for the misrepresentation. It is also
sufficient to allege economic injury.")

Salas's Song-Beverly Act claim is based not on misrepresentations, but on
Defendants' alleged failure to provide the Service Contract timely, or to clearly and
conspicuously disclose plan limitations. Salas alleges facts *tending to show* that
Defendants' failures caused harm sufficient to confer statutory standing: paraphrasing,
he alleges that Defendants' failure to provide the Service Contract immediately before
or promptly after he purchased it "prevent[ed] [him] from discovering the plan
misrepresentations," SAC ¶¶ 63, 66, and that Defendants' failure to clearly and
conspicuously state plan limitations "was a contributing factor" in Salas not
identifying those limitations timely. SAC ¶ 174. These allegations are just sufficient to
confer statutory standing, that is, to allege that Defendants' conduct caused harm.

AIGWG's other standing challenges go more to whether Plaintiffs have
satisfied Fed. R. Civ. P. 9(b), and whether the allegations of misrepresentations and
injury are plausible or adequately pled under Fed. R. Civ. P. 12(b)(6). The Court will
consider such arguments when it addresses whether Plaintiffs have otherwise stated
their claims.

The Court concludes that the Plaintiffs have alleged economic harm sufficient
to establish statutory standing for their claims for violation of the UCL, CLRA, FAL,
and Song-Beverly Act. AIGWG's motion to dismiss these claims for lack of standing
is therefore **DENIED**.

### B. Plaintiffs Allege their CLRA, FAL, and UCL Claims (Counts 1, 2, and 4) with Sufficient Particularity

Defendants argue that Plaintiffs' claims under the CLRA, FAL, and UCL must
be dismissed because Plaintiffs did not plead the alleged misrepresentations with

1    particularity.

2        CLRA, FAL, and UCL claims that "sound in fraud" must be pled with

3    particularity under Rule 9(b). *Chulick-Perez LLC v. CarMax Auto Superstores Cal.*,

4    2014 WL 2154479, at *6-7 (E.D. Cal. 2014*); see also Williams v. Apple, Inc.*, 449

5    F.Supp.3d 892, 911 (N.D. Cal. 2020) (FAL claims). Plaintiffs' CLRA, FAL, and UCL

6    claims all sound in fraud, so Plaintiffs were required to plead them all with

7    particularity under Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th

8    Cir. 2009). Plaintiffs recognize that these claims must be pled with particularity, but

9    argue that they have done so, at least as to some alleged misrepresentations. *See*

10    Opp'n 8:19-26, referring to SAC ¶¶ 50-62, 69-71, 83-87 (allegations that "satisf[y] the

11    'what' of the fraud by identifying the misrepresentations they viewed"); SAC ¶¶ 48-

12    49, 68-69, 83 (the "'where' and 'when' of the fraud is alleged as to each Plaintiff");

13    SAC ¶¶ 114-116 ("the 'how' is alleged by explaining how the Defendants'

14    misrepresentations differ from the actual benefits available under Plaintiffs' Service

15    Contracts"); SAC ¶¶ 49, 69, 83. ("the 'who'," Defendants). Given Plaintiffs' focus on

16    these specific paragraphs, the Court deems Plaintiffs to have conceded that any claims

17    based on *other* alleged misrepresentations do not satisfy Rule 9(b).

18        As to Salas, the SAC includes the partial image of the webpage he visited and

19    alleges *some* of its misrepresentations with sufficient particularity: he identifies the

20    representations he viewed or reviewed, explained what he understood them to mean,

21    explained how they were misrepresentations, and, ultimately, pled reliance. *See* SAC

22    ¶¶ 51, 52, 53-57, 58, 50, 62.

23        As to Papanek, the SAC includes a partial image of the letter he received, cites

24    the representations in the letter that he understood to mean that the offer was to extend

25    the manufacturer's warranty, alleges that he purchased a "Service Plan in reliance of

26    the representations" in the letter, and alleges that and how the Service Plan differed

27    from what was represented. *See* SAC ¶¶ 69, 70, 73, 78. These allegations satisfy Rule

28    9(b). As to Steacy, the allegations are of similar and are sufficient to satisfy Rule 9(b).

1   Defendants' Motion to Dismiss Plaintiffs' CLRA, FAL, and UCL claims

2   because they were not pled with particularity are therefore **<u>DENIED</u>**. The Court

3   addresses Defendants' remaining challenges to Plaintiffs' claims under Rule 12(b)(6).

4   **C. Plaintiffs Fail to State a Claim for Violation of the CLRA, FAL, or UCL**

5   **(Counts 1, 2, and 4)**

6   The CLRA prohibits "unfair methods of competition and unfair or deceptive

7   acts or practices…in the sale or lease of goods or services to any consumer." Cal. Civ.

8   Code § 1770(a). Furthermore, "[a]ny consumer who suffers any damage as a result of

9   the use or employment by any person of a method, act, or practice declared to be

10  unlawful by Section 1770 may bring an action against that person . . ." Cal. Civ. Code

11  § 1780(a). The FAL prohibits false or misleading advertising. The UCL prohibits "any

12  unlawful, unfair or fraudulent business act or practice . . ." Plaintiff's Complaint

13  alleges that Defendants violated all three prongs of the UCL.

14  Plaintiffs' CLRA, FAL, UCL "fraudulent" business practices, and UCL

15  "unfair" deceptive marketing (SAC ¶ 187(a)-(d)) claims are all based on the same

16  fundamental allegations that Defendants' marketing materials misrepresented or

17  omitted terms of the Service Contract, and that these misrepresentations and

18  omissions induced the Plaintiffs to purchase the Service Contract. Defendants argue

19  that all of these claims fail.

20  Plaintiffs' deceptive marketing claims under the CLRA, FAL, and UCL "are

21  governed by the 'reasonable consumer' test." *Williams v. Gerber Prod. Co.*, 552 F.3d

22  934, 938 (9th Cir. 2008) (citations omitted). Since the test is the same for all three

23  claims, for convenience and brevity, the Court recites the test as stated in the CLRA

24  context. "Conduct that is 'likely to mislead a reasonable consumer' violates the

25  CLRA." *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *8 (C.D. Cal.

26  2014) (citations omitted). The phrase "'[l]ikely to deceive' [or mislead] implies more

27  than a mere possibility that the advertisement might conceivably be misunderstood by

28  some few consumers viewing it in an unreasonable manner. Rather, the phrase

indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances could be misled." *Lavie v. Proctor & Gamble Co.,* 105 Cal.App.4th 496, 508 (2003). A "reasonable consumer" is an "ordinary consumer acting reasonably under the circumstances," who "is not versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 680 (2006) (citing *1A Callmann on Unfair Competition, Trademarks and Monopolies* § 5:17 (4th ed.2004)). But, a plaintiff's unreasonable assumptions about a product's label will not support a claim. *See Becerra v. Dr. Pepper/Seven Up., Inc.*, 945 F.3d 1225, 1229-30 (9th Cir. 2019).

In addition, "CLRA actions may be bought only by a consumer 'who suffers any damage *as a result of the use or employment*' of a proscribed method, act, or practice." *Hale v. Sharp Healthcare,* 183 Cal.App.4th 1373, 1386 (2010) (quoting Cal. Civ. Code §1780(a)) (italics in original). "This language does not create an automatic award of statutory damages upon proof of an unlawful act. Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof." *Id.* (quotations and citations omitted).

Plaintiffs' CLRA claim is asserted in SAC ¶¶ 131-145 (pp. 40-44). It alleges that the marketing materials the Plaintiffs viewed (the website Salas visited, and the letters Papanek and Steacy received) were beset by a litany of misrepresentations and omissions that misled the Plaintiffs into purchasing the Service Plans and that violate in overlapping ways four different subsections of the CLRA: Cal. Civ. Code §1770(a)(5), (a)(7), (a)(14) and (a)(17). These same misrepresentations and omissions also underlie the FAL and UCL "fraudulent" and UCL "unfair" deceptive marketing claims.

Plaintiffs phrase the alleged misrepresentations and omissions slightly differently depending on the claim. For example, the many misrepresentations that underlie the claims for violation of CLRA § 1770(a)(5) (SAC ¶¶ 136, 137) are

repeated in slightly different wording as the basis for Plaintiffs' claims for violation

the CLRA § 1770(a)(7) (SAC ¶ 138) and § 1770 (a)(14) (SAC ¶139); for violation of

the FAL (SAC ¶ 149); and for their UCL "fraudulent" (SAC ¶ 190) and "unfair"

marketing (SAC ¶ 187(a)-(d)) claims. But because the factual allegations are all

fundamentally the same and are subject to the same "reasonable consumer" test, to

avoid repetition the Court will treat them together and refer to these claims as

deceptive marketing claims.

Defendants' alleged misrepresentations can be distilled as the following:

- Defendants marketing materials misrepresented that the Service Plans are
  extensions of, or confer benefits similar to those of, the Whirlpool manufacturer's
  warranty.

- Defendants marketing materials misrepresented that the Service Plan entitles the
  consumer to benefits without incurring additional costs for the full term of the
  plan, i.e., the marketing materials fail to disclose that a buyout may effectively end
  the Service Plan before its full term.

- Defendants marketing materials misrepresented that Defendants would pay for
  "100% parts and labor for covered repairs" when in fact the maximum buyout
  payment is only 75% of the original purchase price.

- Defendants marketing materials misrepresented that there is "no out-of-pocket
  costs on covered repairs and replacements," which is "irreconcilable with the
  Limitation of Liability in the Service Contracts." SAC ¶ 136(e)

- Defendants marketing materials misrepresented how the Service Plans will be
  administered, i.e., the phrases "No Deductible" and "If We Can't Fix It – We
  Replace It" suggest that the product will be either repaired or replaced, when in
  fact the Service Contracts provide that Defendants may exercise buyouts instead.

- Defendants marketing materials misrepresented that repairs are the primary means
  of resolving a claim, when Defendants can and do elect buyouts instead.

Defendants argue that all of these claims are insufficiently pled.

### 1. Plaintiffs' Deceptive Marketing Claims Fail Because Defendants Disclosed the Terms of the Service Contract by Making it Available to Plaintiffs Before Purchase

All of Plaintiffs' deceptive marketing claims fail because the marketing materials that Plaintiffs allegedly reviewed and relied on included language clearly indicating that the marketing materials were not a complete recitation of the terms of the Service Contract and directing the consumer where to find those complete terms.

The webpage Salas viewed included the marketing slogan "If We Can't Fix It – We Replace It[2]," with the superscript 2 directing the consumer to the following nearby corresponding notice just below the "Compare the Savings" table that Salas alleges he viewed and relied on: "[2]A replacement may be of like kind and quality, or in the form of a reimbursement based on the product's original price and age. See the complete terms and conditions for details." *See* SAC ¶ 50. The phrase "terms and conditions" was a hyperlink to the Service Contract. Another note at the bottom of the webpage puts the consumer on notice that there are limitations and exclusions and provides a second link to the terms and conditions, as follows: "Whirlpool Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc. [address], an affiliate of American International Group Inc (AIG). Limitations and exclusions apply. See the complete terms and conditions. Whirlpool is not affiliated with AIG or any of its affiliates. Whirlpool trademarks used with permission." *See* Whirlpool Mot. p. 13.[6]

Salas alleges that he "viewed" the webpage and relied on certain representations on that page, including the slogan "If We Can't Fix It – We Replace It[2]." *See* SAC ¶ 51. (This slogan only appeared on the website Salas viewed, not on the letters Papanek

---

[6] The Court deems this complete version of the webpage to be incorporated by reference into the SAC. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("[I]incorporation-by-reference … prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims.")

and Steacy received, so it is relevant only to Salas's claim.) But it is not plausible that Salas viewed and relied on that slogan but did not notice the nearby qualification associated with the superscript that explains that a replacement might be a prorated reimbursement and that presents a link to the complete terms and conditions. Likewise, given all of the specific representations Salas claims he viewed and relied on, it is not plausible that he did not see the advisement that limitations and exclusions apply, and the second link to the complete terms and conditions.[7]

As for Papanek and Steacy, the marketing letters they received state "**KitchenAid Service Plan Benefits\***" with the asterisk denoting the following associated explanation just above the tear-off payment coupon at the bottom of the letter that both Plaintiffs allege they used: "*KitchenAid Service Plans are offered, sold and issued by AIG WarrantyGuard, Inc. [address], an affiliate of American International Group, Inc. (AIG). Limitations and exclusions apply. See the complete terms and conditions at serviceplans.kitchenaid.com/details. KitchenAid is not affiliated with AIG or any of its affiliates. KitchenAid trademarks used with permission." *See* SAC ¶ 69 (partial reproduction of a letter to Papanek), Holt Decl. Ex. 2 (complete copy of same letter).[8]

Papanek and Steacy allege that they relied on certain statements in their letters, but those letters included the same note that was on the webpage indicating that limitations and exclusions apply and showing the URL for the complete terms and conditions. Neither Papanek nor Steacy deny seeing this text, nor do they deny

---

[7] Plaintiffs contend that the Court's prior Order "held" that the terms and conditions on the website were too inconspicuous to satisfy Defendants' obligations. *See* Opp'n fn. 3 (citing Order p. 11). This is incorrect. The prior Order simply noted that Salas appeared to be making that argument, but the Court did not decide the question and instead resolved the Motions on a different basis—that Salas did not allege facts showing that he was harmed.

[8] As noted above in fn. 4, the Court rejects Plaintiffs' argument that the Papanek letter should not serve as a proxy for the Steacy letter, which is not in the record. The Court considers the Papanek letter as representative of the Steacy letter.

viewing the terms and conditions. It is implausible that someone would review the letters, rely on some of its representations, and tear off the payment coupon, yet fail to see the limitations and exclusions notice and the URL for the complete terms and conditions immediately above that tear-off coupon.

More importantly, *a reasonable consumer* would not have ignored, on the webpage, the marketing slogan's superscript with its nearby qualifying language and link to terms and conditions, or the note towards the bottom of the webpage informing the consumer there were limitations and exclusions and directing them to the complete terms and conditions. Nor would a reasonable consumer have ignored, on the letters, the asterisk at the heading "**KitchenAid Service Plan Benefits\***" directing them to the same language, including the terms and conditions URL, that appears right above the tear-off payment coupon they used. *See Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021) ("deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used"); *Freeman v. Time, Inc*., 68 F.3d 285, 289 (9th Cir. 1995) ("The qualifying language appears immediately next to the representations it qualifies and no reasonable reader could ignore it."); *Dinan v. Sandisk LLC*, 2019 WL 2327923, at *7 (N.D. Cal. 2019) (dismissing CLRA, FAL, and UCL claims under reasonable consumer test because representation was accompanied by asterisk that directed consumer to disclosure, and noting that "asterisks are common in both commerce and elsewhere to denote that the 'reader' should be aware that there is more than meets the eye.")

Plaintiffs argue that the disclaimers and links to the terms and conditions do not remedy Defendants' alleged misrepresentations, observing that "*if* the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 966 (9th Cir. 2016) (referencing *Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008)); *see* Opp'n 1:10-19. However, more recently, in *Whiteside v. Kimberly Clark Corp.*, 108

20

F.4th 771 (9th Cir. 2024), the Ninth Circuit considered the phrase "plant-based*,"
with the qualifying asterisk directing the consumer to the phrase "*70+% by weight."
The Court held that "plant-based" "is plausibly misleading if used without
qualification," but determined that the use of an asterisk and an accompanying
qualifying statement can ameliorate any tendency of the label to mislead. *See
Whiteside*, 108 F.4th at 785. The Court reasoned that if a statement is "ambiguous, a
reasonable consumer would require more information from the back label, and the
back label clarifies that the Products contain both 'natural and synthetic ingredients.'
Even before reading the back label, the presence of an asterisk alone puts a consumer
on notice that there are qualifications or caveats, making it unreasonable to assume
that the Products were 100% plant-based." *Id.* This reasoning applies here: the
superscript and asterisks referenced above put Plaintiffs on notice that there were
qualification and caveats and directed them to the complete terms and conditions for
elaboration.

Furthermore, the object of the transactions here was not a product like a
package of baby wipes (*Whiteside*), a tube of lip balm (*Ebner*), a jar of honey
(*Moore*), or a can of soda (*Becerra*), the salient qualities of which can be
straightforwardly stated on packaging. Here, the Plaintiffs were purchasing a Service
Contract, a necessarily more complicated item whose terms cannot be presented on
*packaging*. Instead, sellers of such contracts advertise them, and in those
advertisements, they paraphrase some of the contract's terms. No reasonable
consumer would expect all salient terms of a Service Contract to be stated in the
advertisements for that contract, and a reasonable consumer would understand,
generally, how contracts work: you have to review the contract to understand its
terms. *C.f., Ebner*, 838 F.3d at 965 (affirming dismissal of claims that lip balm tube
misrepresents the amount of lip balm on ground that such products are "commonplace
in the market. The reasonable consumer understands the general mechanics of these
dispenser tubes and further understands that some product may be left in the tube to

21

anchor the bullet in place.") Accordingly, a reasonable consumer would expect to
have to read the Service Contract itself to ascertain its actual terms and would not rely
solely on advertising or marketing materials, especially those like the website and
letters here that include conspicuous qualifications and caveats, along with references
to the complete terms and conditions.

The linchpin of Plaintiffs' deceptive marketing claims—that the Service
Contract included terms that were either misrepresented by or omitted from the
marketing materials—therefore fails because these same marketing materials made the
Service Contract itself available to Plaintiffs; a reasonable consumer would not have
overlooked the superscript or asterisks, the qualifying language associated with them,
or the links to the Service Plan's complete terms and condition; and a reasonable
consumer would expect to have to consult the Service Contract to understand all of the
terms that Plaintiffs now complain about. Accordingly, Plaintiffs' deceptive marketing
claims fall apart.

Indeed, many of the SAC's allegations admit that the Service Contract itself
discloses the terms that Plaintiffs now complain were either misrepresented in or
omitted from the marketing materials, and the Service Contract otherwise dispels the
Plaintiffs' assumptions about what it offered. For example, the Plaintiffs complain that
the marketing materials failed to disclose the buyout option or its terms, but the
website Salas visited *did* state in the asterisked explanation that a replacement could
be a reimbursement reduced by depreciation, and the Service Contract explains how
the buyout option works in all of the ways that the Plaintiffs claim were either
misrepresented or kept "secret," including the payout limit, how the buyout amount
would be calculated, and that whether to exercise the buyout option was in
Defendants' discretion, among other terms. *See, e.g.*, Service Contract § 11.
SERVICE EVENT, § 12. UNABLE TO REPAIR, and § 14. EXCHANGE OR
BUYOUT. The Plaintiffs complain that the marketing did not disclose that the Service
Plan's coverage would "terminate" if the Defendants elected to provide a buyout, but

the Service Contract itself explains that a buyout would fulfill all of the Defendants'
obligations under the Plan, and in effect end coverage under the Plan: "If pursuant to
Section 14 the Product is Exchanged or a Buyout is provided, Our contractual
obligations under this Agreement are fulfilled." Service Contract § 6. OBLIGATION
FULFILLED; *see also* § 14 (includes "IMPORTANT NOTE," repeating § 6). The
term entitled LIMIT OF LIABILITY also disclosed just that: "The coverage amount
available to You for each claim under this Agreement is the Product-age value
specified in the depreciation schedule Section 14 Exchange or Buyout." Service
Contract § 3. LIMIT OF LIABILITY. The Plaintiffs complain that they believed their
Service Plan would extend their manufacturer's warranty or offer the same service,
but as discussed below, the Service Contract does not represent this; instead, as
explained further below, that is an unreasonable assumption the Plaintiffs made based
on their impressions of how warranties work. This pattern holds for all of the alleged
misrepresentations or omissions Plaintiffs complain of: the "misrepresented" terms
and the omissions were in fact explained and disclosed in the Service Contract that
was itself disclosed and to which Plaintiffs' attention was drawn before purchase.

The only arguable exception to the fact that each misrepresentation or omission
was stated in the Service Contract is the CLRA claim that Defendants violated §
1770(a)(5) by failing to disclose in either the marketing materials or include as a term
of the Service Contract that the consumer must agree to "additional conditions" or
might receive no benefits under the Service Plan. *See* SAC ¶ 137(d). This claim refers
to the Proof of Destruction Affidavit ("PoDA") that Steacy completed to receive his
buyout payment. But, the Service Contract explains that if the Defendants buy out the
appliance, it becomes their property, and "We may, at Our discretion, require the
Product to be returned to Us (or our designee), at Our expense." *See* Service Contract
§ 14. EXCHANGE OR BUYOUT. Thus, the Service Contract states that the
Defendants might require the appliance to be returned to them *or someone else*. The
PoDA requiring the consumer dispose of the unit, for example, through their

municipal trash service, falls within this term. Even if this PoDA "requirement" is beyond the contract, Steacy fails to allege that it harmed him in any way, so he fails to state this claim. For example, he does not allege that he incurred any expense or inconvenience. Indeed, a consumer is unlikely to keep a non-operational appliance in his home and thus is likely to dispose of it anyway, commonly through the free disposal services offered by many California municipalities. Neither Salas nor Papanek allege any facts suggesting that they were subject to extra-contractual obligations, so it does not appear that they alleged this type of CLRA claim.

## 2. Defendants' Marketing Did Not Misrepresent the Terms of the Service Contract

Separately, Defendants' marketing materials were not deceptive as Plaintiffs allege.

First, neither the website nor the letters state or imply that the Service Plan was an extension of, or provided the same benefits as, the Whirlpool manufacturer's limited warranty. For all Plaintiffs, the marketing offered them something called a "Service Plan," which is not the same phrase as "manufacturer's warranty." As to Salas, the website graphic "advertising 'Additional Years of Whirlpool Quality Coverage which shows the standard warranty. . . as being for '1 Year' and states that the consumer can purchase up to five 'additional years of coverage,'" SAC ¶¶ 53, 56, does not say that the additional coverage would be the same as the manufacturer's warranty. Nor does the statement "Add a 3-year plan to your 1-year warranty for a total of 4 years of coverage" (SAC ¶ 57) mean that the "plan" is "extending" the "warranty": again, the words "plan" and "warranty" are different. The statement also distinguishes between the two chronologically, stating that the plan begins after the warranty ends. As for Papanek and Steacy, they point to no representations in the letters that the Service Plan extended the warranty; rather, they simply allege to the effect that the Service Plan's coverage seemed consistent with their understandings of how a warranty worked. But Papanek's and Steacy's assumptions based on

impressions are not enough to establish that Defendants misrepresented the Service

Plans to be extensions of a warranty. Nor do the Plaintiffs allege *in what ways* the

Defendants represented the Service Plan to be like the manufacturer's warranty and

how in fact they differed. For this further reason, this basis of Plaintiffs' claims fail.

Second, the statements the Plaintiffs point to did not mislead as to the duration

of coverage. Simply stated, the statements offered a period of coverage that the

Plaintiffs could buy. But this does not foreclose that the coverage period could end

upon specified conditions, like a buyout, as explained in the Service Contract.

Third, is it unclear what the representation "100% parts and labor for covered

repairs" is alleged to misrepresent. The phrase has the built-in contingency "for

*covered* repairs," suggesting that there are times when Defendants would *not* pay for

"100% parts and labor." Nor is the representation about "covered repairs" inconsistent

with the fact that when the Defendants exercise a buyout, the maximum buyout

payment would be only 75% of the original purchase price: these are two different

resolutions—repair, and buyout.

Fourth, it is not clear how the representation in the letters that there is "no out-

of-pocket repairs on covered repairs and replacements" is "irreconcilable with the

Limitation of Liability in the Service Contracts." SAC ¶ 136(e). It appears that

Plaintiffs suggest that Defendants promised full replacement value, but the

representation is at worst ambiguous, and the line directly above it includes the

asterisk to the qualification that limitations and exclusions apply, and a reference to

the complete terms and conditions.

Fifth, there is no merit to Plaintiffs' complaint that the marketing materials

misrepresent how the Service Plans will be "administered." Plaintiffs complain that

the phrases "No Deductible" and "If We Can't Fix It – We Replace It" suggest that the

product will be either repaired or replaced, when in fact the Service Contracts provide

that Defendants may exercise buyouts instead. But the phrase "No Deductible" is not

rendered misleading simply because the Service Contract allows for a buyout: these

are unrelated concepts. And, there is no allegation that Defendants in fact charge a deductible. Instead, the SAC reflects that the Plaintiffs made unreasonable assumptions about what "No Deductible" means. As for the slogan "If We Can't Fix It – We Replace It[2]" stated on the website, it may be ambiguous, but as explained above it is conspicuously qualified with the superscript 2 leading to the nearby explanatory language: "[2]A replacement may be of like kind and quality, or in the form of a reimbursement based on the product's original price and age. See the complete terms and conditions for details." *See* SAC ¶ 50. The phrase "terms and conditions" was a hyperlink to the Service Contract. Thus, considered as whole, the webpage Salas viewed disclosed that the Service Contract provided for a buyout option based on the depreciated value of the appliance. And, as discussed above, no reasonable consumer would expect to understand all of the terms of a Service Contract from the marketing materials alone and would understand they would have to consult the Service Contract itself—the very task that the marketing website invited Salas to do.

For all of the foregoing reasons, Plaintiffs fail to state their deceptive marketing claims (their CLRA, FAL, and UCL "fraudulent" business practices and "unfair" marketing business practices claims). The Defendants' Motions to Dismiss these claims are therefore **GRANTED**.

### D. Plaintiff Salas Again Fails to State a Claim for Violation of the Song-Beverly Act (Count 3)

The Song-Beverly Act provides that "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation . . . under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Cal. Civ. Code § 1794(a). Salas alleges that the Defendants violated the Song-Beverly Act in two ways: (1) by not "clearly and conspicuously" stating coverage limitations in violation of Civ. Code § 1794.4(c)(5)(A) and (B), *see* SAC ¶¶ 153-174; and (2) by not making the Service Contract available before purchase or providing it after purchase in violation of Civil

Code §1794.41(a)(2), *see* SAC ¶¶ 175-181.

In its previous Order, the Court concluded that Salas failed to state these claims. Salas has again failed to state these claims.

### 1. Claim Based on Defendants' Alleged Non-Delivery of the Service Contract (§ 1794.41(a)(2))

The Song-Beverly Act requires that every service contract "be available for inspection by the buyer prior to purchase and either the contract, or a brochure which specifically describes the terms, conditions, and exclusions of the contract, and the provisions of this section relating to contract delivery, cancellation, and refund, shall be delivered to the buyer at or before the time of purchase of the contract." Cal. Civ. Code § 1794.41(a)(2). Salas alleges that the Defendants violated this statute because they did not make the Service Contract available to him prior to purchase and sent him an email confirming his purchase only three days later, and, as such, did not deliver the Service Contract or a brochure describing its terms at or before the time of purchase. *See* SAC ¶¶ 176-178.

The Court's prior Order dismissed this claim because Salas did not allege that he was damaged by these alleged violations. The Court did not address whether the Service Contract was "made available" before purchase. The Court now concludes that the SAC establishes that the Service Contract was indeed made available to Salas before he purchased it.

Where the service contract's terms "were made available, then the purchaser has no claim under Cal. Civ. Code § 1794.41(a)(2)." *Sanbrook v. Office Depot, Inc.*, 2009 WL 840020, at *2 (N.D. Cal. 2009). As described above, SAC ¶ 50 includes a partial reproduction of the webpage that Salas alleges he viewed. The superscript 2 at the end of the "If We Can't Fix It – We Replace It[2]" slogan, which Salas alleges he viewed and relied on, points to text slightly below and to the right, just under the "Compare the Savings" table, which Salas alleged he reviewed and relied upon. That text states, "See the complete <u>terms and conditions</u> for details," with the terms and

conditions language being a hyperlink to the Service Contract. Plaintiff claims he did not see a link readily making the Service Contract available, *see* SAC ¶ 62, but Plaintiff alleges that he viewed the "If We Can't Fix It – We Replace It[2]" slogan and the "Compare the Savings" table and relied on both, so it is implausible that he did not also see the terms and conditions link the slogan directed him to, that was located right below the table. And as noted above, the complete webpage filed by Whirlpool shows a second link to the terms and conditions, stating "See the complete <u>terms and conditions</u>." More importantly, regardless of whether Salas did or didn't see these links, their location is sufficiently conspicuous that a reasonable consumer would note them. The Court therefore concludes that Salas's claim that the Service Contract was not made available prior to purchase must fail because based on the webpage that Plaintiffs incorporated into the SAC, Defendants *did* make the Service Contract available to Salas before he purchased it.

The Court also concludes that Plaintiff has not cured his failure to plead that he was damaged by Defendants' 3-day delay in "deliver[ing]" the Service Contract to Salas before or at the time of purchase, in violation of § 1794.41(a)(2). Plaintiff attempts to cure this omission with the following paragraph: "Had Salas received his Service Contract within the timeframe that California legislature prescribed under Song-Beverly, he would have been more likely to carefully scrutinize it and, perhaps, could have spotted the various plan limitations that are scattered throughout the Service Contract." SAC ¶ 180. Defendants argue that this allegation is too equivocal to establish any harm caused by the 3-day delay in delivery.

Simply stated, Salas's new allegation that had he would have been "*more likely to* carefully scrutinize" the contract at the time of purchase, and "*perhaps, could have* spotted" the plan limitations is speculative and therefore insufficient to establish harm as necessary to state a claim. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.") While the legislature did enact these statutes to require the contract to be made available before purchase

and to "be delivered" before or at the time of purchase, it also conditioned the right to
bring a civil action on being "damaged" by the failure to do so. Salas's allegations of
damage are too speculative to sustain this claim.

### 2. Claim that Service Plan's Exclusions and Limitations Were Not "Clear and Conspicuous" In Violation of § 1794.4(c)(5)(A-B)

The Song-Beverly Act provides that, "[e]xcept as otherwise expressly provided
in the service contract, every service contract shall obligate the service contractor to
provide to the buyer of the product all of the services and functional parts that may be
necessary to maintain proper operation of the entire product under normal operation
and service for the duration of the service contract and without additional charge."
Cal. Civ. Code § 1794.4(b). The Act also requires, in relevant part, that "[t]he service
contract. . . contain . . . clear and conspicuous statements of the following: (A) Any
services, . . . repairs, or remedies that are excluded from the scope of the service
contract. (B) Any other limits on the application of the language in subdivision (b). . ."
Cal. Civ. Code § 1794.4(c)(5)(A-B). "'Clear and conspicuous' and 'clearly and
conspicuously' means a larger type than the surrounding text, or in a contrasting type,
font, or color to the surrounding text of the same size, or set off from the surrounding
text of the same size by symbols or other marks, in a manner that clearly calls
attention to the language." Cal. Civ. Code § 1791(u).

Plaintiff alleges that Defendants violated § 1794.4(c)(5) because the Service
Contract's exclusions and limitations were not sufficiently "clear and conspicuous."
*See* SAC ¶¶ 153-174. These paragraphs of the SAC discuss several sections of the
Service Contract, but they are chaotic and the SAC does not clearly identify which of
these sections are exclusions and limitations subject to § 1794.4(c)(5)(A-B) and
instead leaves it to the Court to figure this out, which the Court will not do.

In its prior Order, the Court determined that Sections 3, 14, and 18 are
presented in a clear and conspicuous manner as a matter of law. It is true that the prior
Order overlooked and did not expressly address section 11, and based on Plaintiffs'

1  opposition, it appears that this claim is now focused on section 11 of the Service

2  Contract. Section 11 reads:

3      "**11. SERVICE EVENT.** After Your claim is authorized, We will, at Our

4      option, (a) repair Your Product, using parts pursuant to Section 13 Repair Parts,

5      or (b) Exchange or Buyout Your Product as provided in Section 14. The

6      decision to repair, Exchange, or Buyout Your Product will be made solely by

7      Us.

8      **IMPORTANT NOTE:** If three service repairs have been completed on the

9      same part, and that part requires a fourth repair, as determined by Us, we will

10     likely **at our sole discretion** - provide an Exchange, or Buyout for Your

11     Product as provided under Section 14."

12     This section uses the same formatting that sections 3, 14, and 18 use, and the

13  Court again concludes that the use of all-caps and bolded font is sufficiently clear and

14  conspicuous to draw attention to section 11's exclusions and limitations so as to

15  satisfy § 1794.4(c)(5)(A-B).

16     For the above reasons, Salas fails to state his claims for violation of the Song-

17  Beverly Act. The Defendants' Motions to Dismiss these claims are therefore

18  **<u>GRANTED</u>**.

19  **E. Plaintiffs Lack Standing to Seek Injunctive Relief**

20     Plaintiffs seek an order "[e]njoining Defendants from the unlawful and unfair

21  practices alleged herein." SAC Prayer For Relief ¶ (i). Defendants argue that Plaintiffs

22  lack standing to seek this relief.

23     To establish standing for injunctive relief, Plaintiff must plead facts establishing

24  a "'concrete and particularized legal harm, coupled with a sufficient likelihood that he

25  will again be wronged in a similar way.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d

26  974, 985–86 (9th Cir. 2007) (citations omitted). To show "a sufficient likelihood" of

27  again being wronged, Plaintiff "must establish a 'real and immediate threat of

28  repeated injury.'" *Id*. (citation omitted)). "In addition, the claimed threat of injury

1  must be likely to be redressed by the prospective injunctive relief." *Id*. at 985.

2       The Court previously concluded that Salas did not plead any facts to plausibly

3  show that he is likely to be harmed in a similar way again. The Court again concludes

4  that Plaintiffs lack standing to seek injunctive relief. First, Plaintiffs apparently

5  concede that neither Salas nor Papanek has standing to seek injunctive relief as the

6  opposition argues only that Steacy has standing to do so. But standing for injunctive

7  relief requires facts plausibly showing that a plaintiff is likely to be harmed again. The

8  opposition points to no facts alleging that Steacy would like to purchase a service

9  contract in the future, nor would such an inference be plausible given that Steacy is

10 apparently now aware of the objectionable terms of the Service Contract and how it is

11 administered. Indeed, the entire premise of this action is that none of the Plaintiffs

12 would have purchased the Service Contract if they knew then what they know now.

13 This negates standing to seek injunctive relief. *See In re Coca-Cola Prods. Mktg. &*

14 *Sales Practices Litig. (No. II)*, 2021 WL 3878654, at *2 (9th Cir. 2021) (plaintiffs

15 failed to establish standing for injunctive relief because they did not allege that they

16 "would want to purchase Coke again in the future. Without any stated desire to

17 purchase Coke in the future, [plaintiffs] do not have standing to pursue injunctive

18 relief.") Plaintiffs argue that Steacy has standing because he may submit a claim under

19 his Service Plan in the future, but this makes no sense: Steacy already received a

20 buyout so Defendants no longer have any obligations under the Plan, and because, as

21 AIGWG explains, the Plan's term has already ended so Steacy cannot plausibly make

22 a claim under it.

23       Plaintiffs also point out that "they" seek public injunctive relief under the

24 CLRA claim. *See* SAC ¶ 144. But a plaintiff seeking a public injunction must still

25 establish standing for injunctive relief. *See Stover v. Experian Holdings, Inc.*, 978

26 F.3d 1082, 1087 (9th Cir. 2020) ("to seek public injunctive relief in federal court,

27 Stover must also allege that she has Article III standing"); *see also Herrera v. Wells*

28 *Fargo Bank, N.A.*, 2020 WL 5804255, at *5 (C.D. Cal. 2020) (concluding that a

plaintiff "has not adequately shown standing [to seek public injunctive relief] because he has not addressed how his actual or imminent injury would be redressed by a favorable decision. Therefore, Herrera has not shown an actual or imminent injury to himself sufficient to support public injunctive relief.") No Plaintiff has pled facts that establish standing for injunctive relief of any kind.

Thus, insofar as Plaintiffs' claims seek injunctive relief, they fail for this additional reason. Defendants' Motion to Dismiss Plaintiffs' claims for injunctive relief are therefore **GRANTED**.

### F.  Plaintiffs Fail to State a UCL Claim (Count 4)

The UCL, California's unfair competition law, prohibits "any unlawful, unfair or fraudulent business act or practice . . ." The UCL provides "distinct and limited equitable remedies" of injunctions and restitution. *Rose v. Bank of America, N.A.*, 57 Cal.4th 390, 397 (2013). Plaintiffs allege that Defendants violated all three prongs of the UCL. Defendants argue that Plaintiffs fail to state any of these claims.

### 1.  Plaintiffs Lack Standing to Pursue their UCL Claims

A private plaintiff suing under the UCL may seek only the equitable remedies of injunctions and restitution. *See Lee v. Luxottica Retail North America, Inc,* 65 Cal.App.5th 793, 800 (2021); *see* Cal. Bus. & Prof. Code § 17203 (authorizing injunctions and restitution). The only such relief that Plaintiffs include in their UCL allegations is a public injunction. *See* SAC ¶ 190. The only relief available under the UCL that Plaintiffs name in their 11-item prayer for relief is injunctive relief. *See, e.g.*, Prayer (i) (injunctive relief). But, as discussed above, Plaintiffs lack standing to seek injunctive relief. Accordingly, because Plaintiffs seek no other remedy in connection with their UCL claim, they cannot pursue their UCL claims.

//

//

### 2. Plaintiffs Fail to State Any UCL Claims

In the alternative, Plaintiffs otherwise fail to plead their UCL claims. [9]

#### a. Plaintiffs Fail to State a Claim Under the "Unlawful" Prong

To state a claim under the UCL's "unlawful" prong, a plaintiff must allege that a defendant "engaged in a business practice forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1044 (9th Cir. 2010) (citation omitted). The SAC premises this claim on Defendants' alleged violations of the CLRA, FAL, and the Song-Beverly Act. *See* SAC ¶ 186. But, as discussed above, Plaintiffs have failed to state any of these predicate statutory claims, so their UCL "unlawful" claim fails.

#### b. Plaintiffs Fail to State a Claim Under the "Unfair" Prong

In an action brought by a consumer, a practice may be "unfair" under the UCL if it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) (distinguishing tests for consumer actions and competitor actions) (citation omitted). The SAC alleges that the Defendants engaged in six unfair practices. SAC ¶ 187(a)-(f). Subsections (a)-(d) allege unfair "deceptive marketing practices," and subsections (e) and (f) allege unfair "contracting practices."

"California courts have not clearly articulated a single definition of an unfair business practice." *Evans v. BBG Communications, Inc.*, 2010 WL 5901096, at *4 (S.D. Cal. 2010). The California Supreme Court has recently observed that "since *Cel-Tech*, a split of authority has developed in the Courts of Appeal with regard to the proper test for determining whether a business practice is unfair under the UCL in

---

[9] The Court finds above in Section C, which addresses the CLRA, FAL, and part of the UCL claims, that Plaintiffs' UCL "fraudulent" business practices claim and their "unfair" business practices claim based on Defendants' marketing practices fail. For completeness, the Court addresses these UCL "fraudulent" and "unfair" claims again within this UCL-specific section.

1    consumer cases, *with appellate decisions adopting three different tests* for determining

2    unfairness in the consumer context." *Nationwide Biweekly Administration, Inc. v.*

3    *Superior Court*, 9 Cal.5th 279, 303 (2020) (emphasis added). In their opposition,

4    Plaintiffs invoke what appear to be two tests, as paraphrased in *Evans*: "[i]n *Lozano*,

5    the Ninth Circuit explained that California courts define an unfair business practice as

6    [1] either a practice that undermines a legislatively declared policy or threatens

7    competition, or [2] a practice that has an impact on its alleged victim that outweighs

8    the reasons, justifications, and motives of the alleged wrongdoer." *Evans*, at *4 (citing

9    *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007)). This Court

10    will therefore consider the two tests discussed in *Evans*.

11    　　　　As noted, the SAC alleges that the Defendants engaged in six unfair practices.

12    SAC ¶ 187(a)-(f). Subsections (a)-(d) repeat Plaintiffs' deceptive marketing theories

13    underlying their CLRA and FAL claims. Plaintiffs argue that Defendants' allegedly

14    deceptive marketing is unfair under the first test—sometimes called the "tethering

15    test" because the conduct is tethered to legislative policy—because the marketing is

16    misleading and thus undermines the purposes of the CLRA. However, for the reasons

17    discussed above, the Court finds that Defendants' marketing materials were not

18    misleading. Plaintiffs also argue that Defendants' marketing that allegedly

19    misrepresents that the Service Plans extend or offer benefits comparable to the

20    Whirlpool warranty is unfair within the meaning of the second test because the harm

21    created by these impressions outweighs any benefits. But again, the Court has found

22    that Defendants' marketing simply does not misrepresent that the Service Plan extends

23    the warranty or offers the same benefits; rather, to the extent Plaintiffs believed this, it

24    was an unreasonable assumption. Overall, Plaintiffs' theory of how Defendants'

25    marketing practices are "unfair" is simply a different way of saying those practices are

26    "deceptive," and the Court concludes above that the practices are not deceptive. In

27    sum, the Court's determination that Defendants' marketing representations were not

28    deceptive to a reasonable consumer eliminates the premises of Plaintiffs' claims that

1    Defendants' marketing practices were "unfair" in violation of the UCL.

2         Subsections (e) and (f) allege unfair "contracting practices:" (e) that the Service

3    Contract does not sufficiently explain the "how AIGWG and/or Administrator actually

4    administer the Service Plans through their business policies such as their use of

5    Payout Limits"; and (f) the "complex contractual language and nested contract

6    provisions" in the Service Contract prevents consumers "from understanding the

7    limited scope of the Service Plan benefits." Plaintiffs argue that both "contracting

8    practices" violate both the tethering test and the balancing test. But as discussed

9    above, the Service Contract fully explains the payout limits that apply when

10   Defendants exercise a buyout: it is unclear what explanation is missing about the

11   payout limits, or about Defendants' other unspecified "business policies." Nor is the

12   Service Contract's language complex or unreasonably hard to understand. One must

13   simply read the Service Contract. Furthermore, none of the three Plaintiffs alleged that

14   they actually read or attempted to read the Service Contract but that it evaded their

15   understanding, either as to the payout limit, or Defendants' unspecified "business

16   policies," or as to the scope of the benefits more generally. Accordingly, the Court

17   concludes that none of the Plaintiffs allege that they were actually injured by how the

18   Service Contract is worded, so none of the Plaintiffs has standing to pursue their claim

19   that Defendants' "contracting practices" are "unfair" in violation of the UCL.

20            **c.  Plaintiffs Fail to State a Claim Under the "Fraudulent" Prong**

21        Plaintiffs' claim under the "fraudulent" prong relies on the same marketing

22   misrepresentations and omissions that Plaintiffs rely on for their CLRA and FAL

23   claims. *See* SAC ¶ 189 ("The misrepresentation and omissions alleged above

24   constitute fraudulent business practices."); *see also* Opp'n 50:23-24 ("Defendants'

25   misrepresentations and omissions which form the basis of their CLRA claims also

26   violated the FAL and UCL [fraudulent prong].") Thus, Plaintiffs recognize that their

27   claim under the UCL fraudulent prong stands or falls with their CLRA claims. As

28   discussed above, Plaintiffs' CLRA claims fail because they have not plausibly alleged

deceptive marketing, so Plaintiffs' claims under the UCL fraudulent prong fail as well.

For all of the foregoing reasons, Plaintiffs fail to state any claims for violation of any prong of the UCL. Defendants' Motions to Dismiss Plaintiffs' claims for violation of the UCL (Count 4) are therefore **GRANTED**.

### G. Plaintiff Steacy Fails to State a Claim for Breach of Contract (Count 5)

To plead a claim for breach of contract, a plaintiff must allege that (1) the parties had a contract, (2) plaintiff performed, (3) the defendant breached, and (4) the defendant's nonperformance caused the plaintiff harm. *Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011). As to the first element, in actions involving breach of a written contract, the plaintiff must "allege the specific provisions in the contract creating the obligation the defendant is said to have breached." *Young v. Facebook, Inc.*, 790 F.Supp.2d 1110, 1117 (N.D. Cal. 2011). "Causation resulting in damage is an essential element of a claim for breach of contract." *Manchester v. Sivantos GMBH*, 2019 WL 3734307, at *3 (C.D. Cal. 2019) (citation omitted).

Defendants argue that Steacy failed to allege facts that establish either breach of the Service Contract, or damages. Plaintiffs respond that Defendants breached the Service Contract by (1) failing to repair or replace Steacy's dishwasher and instead buying it out, and (2) by terminating Steacy's repair and replacement coverage when it bought out Steacy's contract. *See* Opp'n pp. 56-57. Plaintiffs also argue that Defendants' conduct harmed Steacy because he was deprived of repair and replacement coverage under the Service Contract. *See id.* at 57-58.

Steacy has not alleged either breach or damages. The Service Contract specifically provides for the buyout option that Defendants exercised. *See* Service Contract § 11. SERVICE EVENT ("After Your claim is authorized, We will, at Our option, (a) repair Your product, using parts pursuant to Section 13 Repair Parts, or (b) Exchange or Buyout Your Product as provided in Section 14. The decision to repair, Exchange, or Buyout Your product will be made solely by Us."); § 14. EXCHANGE OR BUYOUT ("We have the option, at Our sole discretion, to (a) Exchange Your

Product with a replacement product of like-kind and quality with similar features and functionality, which may be new or refurbished or contain nonoriginal manufactured parts; or (b) Buyout Your Product with a cash settlement based on the original purchase price of the covered Product, excluding taxes, delivery and installation fees ('Original Purchase Price'). The value of any Exchange or Buyout, and Our maximum liability under this section, will be greater of (1) the annual cost of this Agreement; or (2) determined according to the age of the covered Product using the following depreciation schedule: [Product-Age Exchange or Buyout Amount]").

Nor did the fact that the Service Contract "terminated" upon the buyout equate to breach; the Service Contract's 14. EXCHANGE OR BUYOUT provision includes the following: "**IMPORTANT NOTE:** Pursuant to Section 6 Obligation Fulfilled, all of Our contractual obligations under this Agreement for the specified Product will be satisfied if We Exchange or Buyout Your Product pursuant to this section." Service Contract § 14. EXCHANGE OR BUYOUT. Accordingly, as the Court previously held, by its terms, a buyout fulfills all of the Defendants' contractual obligations and Defendants had no contractual obligation to continue to provide coverage for the remainder of the plan.[10] *See Bevis v. Terrace View Partners, LP*, 33 Cal.App.5th 230, 260 (2019) ("a contracting party's performance of a contract in accordance with its express terms or the law cannot constitute a breach of the contract.") It also follows that the fact that a buyout fulfills all of Defendants' obligations and effectively ends the term of the Service Contract does not equate to "harm" or damages because this is exactly what the Service Contract provides.

Finally, Steacy also argues that the Defendants breached the Service Contract by requiring him to complete a Proof of Destruction Affidavit ("PoDA") in order to receive the buyout payment. *See* SAC ¶ 197. Steacy alleges that because the

---

[10] Nor would providing or expecting service for an appliance after it was bought out make any sense because the consumer would no longer own the appliance.

1    obligation to complete the PoDA is not in the Service Contract, requiring it was a

2    "material deviation[] from the parties' contract." SAC ¶ 198. But a "material

3    deviation" from the contract does not establish breach. In order to plead a breach,

4    Steacy must point to a specific contract provision that the Defendants did not perform,

5    and Steacy has not done so for his breach of contract claim based on the PoDA. *See*

6    *Mason v. Allstate Ins. Co.*, 2014 WL 212245, at *3 (C.D. Cal. 2014) (plaintiff's claim

7    for breach of contract failed because it didn't allege what term of the agreement

8    defendant's conduct breached). Defendants also point out that Steacy has not alleged

9    or pointed to any damages arising out of the additional obligation to sign the PoDA;

10   upon review of the SAC, the Court agrees. Furthermore, Plaintiff has not responded to

11   this in his opposition and therefore has conceded it. *Chamndany v. Harding*, 2022 WL

12   19263348, at *15 (C.D. Cal. 2022) (observing that "a plaintiff who does not respond

13   to a defendant's argument on a motion to dismiss may be deemed to have conceded

14   that argument," and citing cases so holding).

15        For all of these reasons, Steacy not alleged breach of any contract term or

16   damages and therefore fails to state a claim for breach of contract. Defendants'

17   Motions to Dismiss Steacy's claim for breach of contract (Count 5) are therefore

18   **GRANTED**.

19   **H. The Court Declines to Grant Leave to Amend**

20        The Court should freely grant leave to amend a dismissed complaint unless it is

21   clear the complaint could not be saved by amendment. Fed. R. Civ. P. 15(a);

22   *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

23   However, a "'district court's discretion to deny leave to amend is particularly broad

24   where plaintiff has previously amended the complaint.'" *Cafasso v. Gen. Dynamics*

25   *C4 Sys.*, 637 F.3d 1047, 1058 (9th Cir. 2011).

26        Plaintiffs' SAC is the third complaint filed in this matter and it is exhaustive.

27   The SAC was filed with the benefit of the Court's extensive order dismissing the

28   original Complaint, and with the benefit of Defendants' Motions to Dismiss the First

Amended Complaint (which the Court did not have to rule on). The original Plaintiff Salas has had three chances to plead his claims so the Court concludes that they cannot be cured by further amendment. Plaintiffs Papanek and Steacy are named for the first time in this Second Amended Complaint. However, they were added with the benefit of the Court's and defense counsel's prior work regarding Salas's claims, all of which applied similarly to the two new Plaintiffs. Thus, Plaintiffs' counsel was well-positioned to plead Papanek's and Steacy's claims sufficiently the first time, if it was possible to plead them sufficiently at all. That their claims rely on the letters they received rather than on the website Salas viewed is a distinction without a difference. If anything, the letters are a simpler advertisement than the website, so pleading these claims should have been more straightforward. That Papanek's and Steacy's claims are nevertheless insufficiently pled leads the Court to conclude that any amendment as to their claims would be futile, so the Court denies leave to amend and will dismiss this action with prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss are **<u>GRANTED</u>** and the Second Amended Complaint is **<u>DISMISSED WITH PREJUDICE</u>**.

Defendants are **<u>ORDERED</u>** to file a Proposed Judgment within 5 days of this Order. Plaintiffs will have 5 days thereafter to object as to form.


**IT IS SO ORDERED.**


Dated: October 30, 2025                  _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

39